[Civ. No. 4817. Fourth Dist. June 29, 1954.]

PHYLLIS K. ASHLEY et al., Appellants, v. J. CYRUS JONES et al., Respondents.

Butterworth & Butterworth and Edward L. Butterworth for Appellants.

Luce, Forward, Kunzel & Scripps and James L. Focht, Jr., for Respondents.

BARNARD, P. J.—This is an action for damages for injuries to Mrs. Ashley, alleged to have resulted from the slipping of a rug in the home of the defendants. The accident occurred on January 1, 1951.

Mr. Ashley is the pastor of a church in Compton. He was formerly the pastor of a church in San Diego which is attended by the defendants. This San Diego church had acquired a parcel of land and Mr. Jones was chairman of a committee which was seeking to dispose of this land. The two couples were warm friends and had frequently visited in each other's homes, at times staying overnight. Some months prior to

December, 1950, Mr. Jones called on Mr. Ashley in Compton, seeking his advice concerning this land. In December, 1950, Mrs. Jones, at her husband's request, wrote to Mrs. Ashley asking her and her husband to come to San Diego stating that Mr. Jones was anxious to talk to Mr. Ashley about this land. Mrs. Ashley replied that they could come during the coming holidays. Mrs. Jones replied that they appreciated Mr. Ashley's planning to come and asked them to stay overnight New Year's night, saying that they would like to invite some friends in to meet them. Mrs. Ashley replied that they would be able to stay that night but would have to leave early the next morning.

Mr. and Mrs. Ashley came to the Jones home toward night on December 31, 1950. When they arrived Mr. Jones told Mr. Ashley that he appreciated his coming down to consult him about the disposal of this property. Mr. Ashley testified that his sole purpose in coming was to give Mr. Jones information and advice about this land, and Mrs. Ashley testified that she nearly always traveled with her husband to look out and care for him. During that evening the two men discussed the land problem and the next day had further talks concerning it.

Shortly before 5 p. m. on January 1, 1951, Mr. Jones returned to his home, noticed that the women were in the kitchen, and went to his bedroom. Mr. Ashley was not in the house at the time of the accident. The women were preparing refreshments for the expected guests. Mrs. Jones noticed it was getting late, and said she would not be through in time to greet the guests. Mrs. Ashley said she would freshen up and answer the door. As she passed through a hall on the way to her bedroom she stepped on a rug which slipped, and she fell on her left side. This hallway was well lighted, and this was a 4 x 6 rug. There was no pad under the rug and the rug was not fastened to the floor. Mrs. Ashley got up, straightened the rug and went into her bedroom. She felt pain in her shoulder, arm and leg. She answered the doorbell and received some 15 or 20 people who came. After the guests left, about 8 :30 p. m., she told her husband and the defendants about the fall. The Ashleys left for home the next morning, and on January 14, 1951, consulted a doctor. On January 20, Mrs. Ashley came to San Diego and stayed with the defendants some ten days while she was having some dental work done. She was treated by a doctor at home during February and March, and on April 9 con-

sulted a doctor in Santa Barbara. She spent some seven weeks in a hospital and then wore a brace for some six months. She testified that her first doctor said the trouble might be bursitis but that there was never any definite decision that it was bursitis. Evidence was received as to various medical expenses.

Mrs. Ashley testified that the floor in this hall was a dark hardwood, such as you would find in the average home, and that Mrs. Jones told her after the accident that she had had a boy clean the floors recently but had not had them highly polished or waxed; that she had walked over this rug on many occasions before; that on such occasions it had never "slipped at all," or moved "in the least"; and that she had never seen anyone slip on it. Mrs. Jones testified that she had heard rather than seen her young daughter or one of her little friends accelerate her speed, jump on the rug and cause it to slip; that she had then seen the rug disarranged; that to her knowledge neither of the plaintiffs had ever slipped on the rug on any other occasion; that as a usual thing the rug did not move when she stepped on it; that on some occasions when she stepped on the rug "it has moved, it has been disarranged"; that when it moves it is a rare occasion; that she has walked over the rug daily without any difficulty; that while the rug has moved at times "I haven't slipped particularly. The rug has been disarranged"; that at times the way you put your foot on it would cause the rug to slide, sometimes more, sometimes less; and that she did not recall ever telling the Ashleys that this rug had slipped on occasions. Mr. Jones testified that in nearly every case when he would walk on the rug it would not slip; that on occasions when he would step on the rug it would move more or less; that it had never occurred to him that the rug might slip and injure someone; that "It never slipped that much with me"; that on every occasion when he saw either of the plaintiffs walk on the rug it remained stationary; that he had never told the plaintiffs that there was no pad under the rug; and that he had never warned them that the rug had a tendency to slip.

At the conclusion of the plaintiffs' evidence the court granted the defendants' motion for a nonsuit saying, among other things, that all of the parties who knew anything about the accident had testified, that there was no conflict in their testimony on any material matter, and that "I feel that if there were a verdict in favor of the plaintiff it would be my

duty to set it aside." The plaintiffs have appealed from the judgment which followed, contending that Mr. Ashley was an invitee instead of a licensee; that Mrs. Ashley was on the premises for the convenience of her husband and acquired the same status; that it was a question of fact for the jury whether the maintenance of this known hazardous condition constituted negligence; and that even if they were licensees the respondents breached thir duty to give warning of this hazardous condition since they knew that an unreasonable risk existed and had reason to suspect that it would not be discovered by the appellants.

We agree with the trial court's conclusion that on the undisputed evidence a new trial should be granted in the event of a verdict for the plaintiffs. However, in view of the different rules with respect to weighing the evidence which apply in granting a nonsuit, a closer question is here presented. The first question raised is whether under the evidence Mrs. Ashley may be considered as an invitee, as distinguished from a licensee. The duty owed by an owner to an invitee is to exercise reasonable care in maintaining his premises in a safe condition so as not to injure such invitee. (*Butcher* v. *Queen City Iron & Metal Co.*, 99 Cal. App.2d 25 [221 P.2d 265].) The duty with respect to a licensee is somewhat different, the owner not being liable for injuries resulting from a condition of the premises, other than one amounting to a trap, in the absence of some active negligence on the part of the owner. (*Oettinger* v. *Stewart*, 24 Cal.2d 133 [148 P.2d 19, 156 A.L.R. 1221].) As stated in *Popejoy* v. *Hannon*, 37 Cal.2d 159 [231 P.2d 484], "It is the purpose for which a person is on the premises of another which renders him an invitee rather than a licensee." As a general rule, if that purpose is one of common interest or mutual advantage the person is considered an invitee while a licensee is inferred where the object is the mere pleasure or benefit of the visitor. (*Aguilar* v. *Riverdale C. Assn.*, 104 Cal.App. 263 [285 P. 889]; *Demmer* v. *City of Eureka*, 78 Cal.App.2d 708 [178 P.2d 472].)

As distinguished from a business interest between the parties how much of a mutual interest and benefit, aside from mere social interest and pleasure, is required to give a status of invitee to a guest in a home does not seem to have been definitely decided in this state. Mutual interest in church, lodge or political activity without personal gain or benefit is ordinarily considered a part of common social life. This

has been recognized in other states. In *Maher* v. *Voss* (Del.), 84 A.2d 527, it was held that an invitation to attend a meeting of women interested in promoting the interests of a political party constituted the visitor a licensee and not an invitee. In *Comeau* v. *Comeau*, 285 Mass. 578 [189 N.E. 588], the court said:

"There are several well considered decisions in courts of other jurisdictions reaching the conclusion that, where a guest is invited to come upon the premises of his host for social or benevolent purposes, the relation created is not that of invitee and invitor in a business sense but that of licensee or licensor. In such circumstances the host as licensor is held to be under no liability unless the proximate cause of injury to the guest is something in the nature of a trap or active negligence."

In cases in this state, under the automobile guest law, a common interest in attending lodge or society meetings has been held insufficient to change the status of guest. (*Whitechat* v. *Guyette*, 19 Cal.2d 428 [122 P.2d 47]; *Druzanich* v. *Criley*, 19 Cal.2d 439 [122 P.2d 53].)

There is little, if any, evidence in this case to support the theory that Mrs. Ashley was an invitee. She and her husband were guests in this home and the only claimed mutual interest was a benevolent one, to discuss a church activity. In any event that matter had been thoroughly discussed and they intended to leave early the next morning. They had also been invited to, and did, remain over another night for the express purpose of a social gathering with their old friends. This accident happened while Mrs. Ashley was engaged in preparing for these social visitors and as she was hurrying to make herself ready to receive the guests who were momentarily expected.

If it be assumed that the evidence was sufficient to establish her status as an invitee, that fact is not controlling. Even in that event, the duty resting on the defendants was one to exercise reasonable care, and they would not be liable unless they failed to do what an ordinarily prudent person would have done under similar circumstances. In *Nelson* v. *Smeltzer*, 221 Iowa 972 [265 N.W. 924], in upholding a judgment of dismissal, the court said:

"6. The extensive use of hardwood, polished, waxed floors, furnished with rugs, in homes is common knowledge. 7. Common experience teaches that this type of floor and furnishing, in such general use, is not inherently dangerous or a hazard

to the safety of an employee or an invitee within the standard of care required.  8. There is nothing in the record to distinguish the floors and rugs in the Ringland home from the hardwood polished floors and rugs in the average home.''

In *Brown* v. *Davenport Holding Co.*, 134 Neb. 455 [279 N.W. 161, 118 A.L.R. 423], in upholding a directed verdict the Supreme Court of Nebraska said:

''The ordinary condition of an apartment or a home confronted the appellant.  It is not comparable to a defect such as a hole in the floor, or a sloping aisle in a store.  The common use of waxed and polished floors, covered with small rugs, in homes and apartments is a matter of common knowledge.  In the instant case the evidence establishes that the appellant knew of such use.  They are not inherently dangerous to invitees.

''In the absence of unusual circumstances and conditions, the maintenance of polished hardwood floors and the use of small rugs in an apartment is not negligence for which the owner is liable to a prospective tenant invited to inspect the premises. . . . Though a polished floor is slippery and light rugs are apt to slide, since such rugs are in common use their use is not negligence unless there is something unusual about them.  There was nothing unusual about the floor or the rug in this case, and the verdict was properly directed.''

This rug was similar to those commonly used in nearly all homes, many of which do not have pads under them.  There was nothing inherently dangerous about the rug in the absence of unusual conditions.  ■  It is a matter of common knowledge that such rugs, or a part thereof, will occasionally slip or move a little whether they have pads under them or not.  This happens many times in the average home without injury, and without giving cause for believing them to be dangerous.

■  The undisputed evidence is that Mrs. Ashley had walked over this rug on many occasions without noticing anything wrong; that Mrs. Jones had walked over it daily without any difficulty; that while on some occasions it had moved or been disarranged this had rarely happened and she had never ''slipped particularly''; and that Mr. Jones had had a similar experience to the extent that it had never occurred to him that this rug might slip and injure anyone.

There was no evidence that this rug had ever slipped enough to hurt anyone or to cause alarm; Mrs. Ashley herself had had a very considerable experience with the rug; and there is no evidence that the defendants knew that it created a

dangerous situation and none that is sufficient to show that they should have so known. Not knowing that an unreasonable risk existed, there was no breach of duty on their part in failing to warn the plaintiffs of a hazard of which they themselves were unaware.

We conclude that there was no evidence here which was sufficiently substantial to have supported a verdict for the plaintiffs, and that the court was justified in making the order in question.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.

A petition for a rehearing was denied July 26, 1954, and appellants' petition for a hearing by the Supreme Court was denied August 26, 1954. Gibson, C. J., and Carter, J., were of the opinion that the petition should be granted.