[S. F. No. 22116. In Bank. June 6, 1966.]

MICHAEL ANTHONY O'KEEFE, a Minor, etc., Plaintiff and Appellant, v. SOUTH END ROWING CLUB, Defendant and Respondent.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

Silvers, Hauer & O'Neill, Jeremiah F. O'Neill, Jr., and Morton L. Silvers for Plaintiff and Appellant.

O'Connor, Moran, Cohn & Lynch, George Olshausen and Harold H. Cohn for Defendant and Respondent.

MOSK, J.—In this action for personal injuries plaintiff appeals from a judgment of nonsuit entered at the close of the presentation of his evidence. ▆ The rule is familiar that "A nonsuit may be granted only where, disregarding conflicting evidence on behalf of the defendants and giving to plaintiff's evidence all the value to which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff." (*Reynolds* v. *Willson* (1958) 51 Cal.2d 94, 99 [331 P.2d 48] ; *Blumberg* v. *M. & T. Incorporated* (1949) 34 Cal.2d 226, 229 [209 P.2d 1] ; *Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768].) ▆ A careful analysis of the record of this brief trial impels us to the conclusion, however reluctant, that it contains no substantial evidence to support a verdict for plaintiff under any tenable theory of liability, and hence that the judgment should be affirmed.

The general factual background of the case will be given first, and further facts will be developed where relevant. Defendant South End Rowing Club leases from the City and County of San Francisco certain waterfront property adjoining its premises near Aquatic Park on San Francisco Bay, and maintains thereon a boat-launching pier for the use of its members. The pier extends across a sandy, sloping beach and out over the water. It appears to be constructed generally perpendicularly to the shoreline, which at this point runs east and west.

About noon on March 14, 1959, plaintiff and two friends arrived at defendant's pier. Their purpose, as plaintiff testified, was to "have fun" with the other youths who congregated at that spot and, in particular, to go swimming and diving from the pier. Plaintiff was 15 years and 8 months old at the time, and his companions were of similar age. They changed into bathing trunks at the Aquatic Park facilities, then made their way to defendant's property by walking some 50 yards along the beach and passing under an adjacent pier. They had been swimming and diving at this location on

several prior occasions, including three or four times that year, and had never asked or been given permission by defendant to use the premises. On the other hand, they had never been specifically told not to swim and dive there, but had only been forbidden to light fires on the beach.

Upon arriving at the premises plaintiff "swam around" and dived several times from *both* sides of the pier, at a point about midway in its length. At the trial he could not recall which side he dived off first, but testified that in diving several times off the east side he swam "a little ways in" before touching bottom and walking up on the beach. Plaintiff's last dive was made off the west side of the pier, directly across from the place where he had made his dives on the east side. At that point the pier was some 15 feet wide. He testified that the dive was a "regular" one, i.e., outward from the pier rather than straight downwards into the water. Nevertheless, he apparently struck his head either on the bottom or on some submerged object, and sustained severe injury to the spinal cord resulting in quadriplegic paralysis. He has regained partial use of his arms, but will always require some assistance in taking care of his personal physical needs.[1]

The question whether there were warning signs on defendant's pier was raised at the trial. Plaintiff testified he saw no such signs. Photographs purporting to depict signs mounted on the pier were marked for identification only and were shown to plaintiff's witness Joe Cardinale. None of these photographs was admitted into evidence, however, for in each instance the witness failed to provide satisfactory identification. The remaining testimony on this point was to the same effect: Janice Babcock testified she did not recall seeing any signs on defendant's pier, and Tom Zaloco testified by deposition that "we didn't see no signs at all." Accordingly, if the case had gone to the jury on the plaintiff's evidence alone, the jurors could not properly have considered that there were any signs on the pier warning against swimming or diving. Since our function on this appeal is limited to determining whether a judgment for plaintiff based on plaintiff's evidence and legitimate inferences drawn therefrom would require reversal for insufficient evidentiary support, we are likewise prohibited

---

[1]Plaintiff's guardian ad litem, his mother, has not joined a claim for reimbursement of medical expenses, for he is apparently being cared for at the moment in publicly supported institutions. As of the date of trial, for example, he had spent three years at the Laguna Honda facility of the City and County of San Francisco.

from speculating what may have been the wording on any signs posted on defendant's pier.

Plaintiff contends that the evidence would support a verdict in his favor on either of two theories of liability: first, that he was an invitee to whom defendant owed a duty of ordinary care to keep the premises reasonably safe for him and to discover hidden dangers thereon; and second, that if in the alternative plaintiff was only a trespasser or implied licensee, defendant was nevertheless liable under the special rule governing trespassing children. We shall consider these theories in the order presented.

In *Oettinger* v. *Stewart* (1944) 24 Cal.2d 133, 136 [148 P.2d 19, 156 A.L.R. 1221], this court quoted the definition of "business visitor" set forth in section 332 of the first Restatement of Torts: "A business visitor is a person who is invited or permitted to enter or remain on land in the possession of another for a purpose directly or indirectly connected with business dealings between them." Under the rules of the first Restatement, only a "business visitor" thus defined enjoyed the privileged status of "invitee"; any other person entering property at the express or implied invitation of the possessor was relegated to the category of "gratuitous licensee," with correspondingly diminished rights against the possessor (first Rest., Torts, § 331). This "economic benefit" theory has been the one most frequently invoked in California when courts have been called upon to determine who is an invitee. For example, in *Popejoy* v. *Hannon* (1951) 37 Cal.2d 159, 169-170 [231 P.2d 484], we approved of an instruction that is typical in this respect: "Whether a person entering the premises of another bears the legal status of an invitee or of a mere licensee depends upon the purpose of the visit. So long as its object is the pleasure of only the visitor or of some third party, or of a purely social nature, then he is, at most, only a licensee. When, however, the visitor has a purpose that is related to the occupant's business or that involves some matter of mutual business interest or advantage, then an invitation to use the premises may be inferred, and whether so inferred or expressed, the invitation and the purpose make the guest an invitee." (Accord, *Smith* v. *Kern County Land Co.* (1959) 51 Cal.2d 205, 208 [331 P.2d 645]; *Speece* v. *Browne* (1964) 229 Cal.App.2d 487, 490-491 [40 Cal.Rptr. 384]; *Clawson* v. *Stockton Golf etc. Club* (1963) 220 Cal.App.2d 886, 896 [34 Cal. Rptr. 184]; *Bylling* v. *Edwards* (1961) 193 Cal.App.2d 736, 739-740 [14 Cal.Rptr. 760].)

In the obvious case of a customer intending to do business and entering upon premises open to the public, such as a shopper in a store, a guest in a hotel, a patron in a restaurant or theater, or a passenger in a railroad station, the "economic benefit" theory usually produces a satisfactory result. So, also, is it appropriate when the premises are private but the visitor comes for a business purpose which is connected with a use to which the possessor puts the land, such as when a deliveryman or repairman is invited to enter a private residence. But there remain a number of situations in which the courts have extended the "economic benefit" theory to confer the status of invitee upon an injured plaintiff who had little if any direct "business" relationship with the possessor. (See, e.g., *Blumberg* v. *M. & T. Incorporated* (1949) *supra*, 34 Cal.2d 226, 229 [social guests of a tenant of an office building, walking through the lobby]; *Kircher* v. *Atcheson T. & S.F. Ry. Co.* (1948) 32 Cal.2d 176, 186 [195 P.2d 427] [person entering railroad depot to meet arriving passenger]; *Crane* v. *Smith* (1943) 23 Cal.2d 288, 297 [144 P.2d 356] [child accompanying mother into store, "regardless of whether it is necessary for the customer to have the child with her in order to shop"]; see generally Prosser on Torts (3d ed. 1964) pp. 396-398, and cases cited; Notes 93 A.L.R.2d 784, 23 A.L.R.2d 1135.)

A second theory, however, has long coexisted with that based on "economic benefit," and has been termed the "public invitation" theory. It declares that "the basis of liability is not any economic benefit to the occupier, but a representation to be implied when he encourages others to enter to further a purpose of his own, that reasonable care has been exercised to make the place safe for those who come for that purpose." (Prosser on Torts (3d ed. 1964) p. 398.) As that author has elsewhere explained, "When land is thus thrown open to the public, the condition of the premises begins to affect the public interest. The occupier does not, of course, become a public utility or a public servant, like a common carrier; nor is his land dedicated irrevocably to public use, since he may always withdraw his invitation and exclude anyone he likes. But when the public, as such, is led to believe that premises have been provided, offered, held out for public entry, both the earlier and the later cases make it clear that the occupier assumes a duty of reasonable care to see that the place is safe for the purpose, which extends to those who are injured when they enter in response to the invitation." (Prosser, *Business Visitors and Invitees* (1942) 26 Minn.L.

Rev. 573, 587.) In many instances, of course, the two theories overlap; thus a customer in a store or restaurant is an invitee on either basis. The question is whether the "invitation" theory should be allowed to operate in areas not reached by the "economic benefit" theory, or whether the latter should be held exclusive.

The courts have not always articulated their reasoning in the precise language of "invitation," but it seems clear that the theory has received increasing application in decisions of our sister states[2] and "is now accepted by the great majority of the courts." (*Handleman* v. *Cox* (1963) 39 N.J. 95 [187 A.2d 708, 715]; accord, *Dowd* v. *Portsmouth Hospital* (1963) 105 N.H. 53 [193 A.2d 788, 790-792, 95 A.L.R.2d 986]; *Murdock* v. *Petersen* (1958) 74 Nev. 363 [332 P.2d 649, 650]; *Crown Cork & Seal Co.* v. *Kane* (1957) 213 Md. 152 [131 A.2d 470, 473-475]; cf. *Le Roux* v. *State* (1954) 307 N.Y. 397 [121 N.E.2d 386, 390, 46 A.L.R.2d 1063]; see generally Note 95 A.L.R.2d 1000-1009; Reporter's Notes to Rest.2d Torts (Tent. Draft No. 5, 1960) § 332, pp. 69-71.) It has the support of the textwriters (Prosser on Torts (3d ed. 1964) pp. 398-401; Harper & James, The Law of Torts (1956) pp. 1478-1487), and has recently been adopted by the Restatement Second of Torts in its concept of "public invitee."

Section 332 of the new Restatement declares: "Invitee Defined. (1) An invitee is either a public invitee or a business visitor. (2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public. (3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land." As stated in comments c and d to that section, "In determining whether a particular person is an invitee, the important thing is the desire or willingness to receive that person which a reasonable man would understand as expressed by the words or other conduct of the possessor. . . . The nature of the use to which the possessor puts his land is often sufficient to express to the reasonable understanding of the public, or classes or members of it, a willingness or unwillingness to receive them. . . . It is not enough, to hold land open to the

[2]In the above cited leading article on the subject Dean Prosser has demonstrated that the "invitation" theory may actually be the earlier one from a historical viewpoint. (Prosser, *Business Visitors and Invitees* (1942) 26 Minn.L.Rev. 573, 576-585.)

public, that the public at large, or any considerable number of persons, are permitted to enter at will upon the land for their own purposes. As in other instances of invitation, there must be some inducement or encouragement to enter, some conduct indicating that the premises are provided and intended for public entry and use, and that the public will not merely be tolerated, but is expected and desired to come. . . . Where land is held open to the public, it is immaterial that the visitor does not pay for his admission, or that the possessor's purpose in so opening the land is not a business purpose, and the visitor's presence is in no way related to business dealings with the possessor, or to any possibility of benefit or advantage, present or prospective, pecuniary or otherwise, to the possessor.''

The principles embodied in new section 332 have been foreshadowed in California decisions. Thus in *Popejoy* v. *Hannon* (1951) *supra,* 37 Cal.2d 159, 167, we said: '' 'An invitation or permission to enter upon land need not be express but may be implied from such circumstances as the conduct of the possessor, the arrangement of the premises or local custom.' (*Oettinger* v. *Stewart,* 24 Cal.2d 133, 136 [148 P.2d 19, 156 A.L.R. 1221].) ' ''The gist of liability consists in the fact that the person injured did not act merely for his own convenience or pleasure, but that an owner or occupant *held out an invitation or allurement which led him to believe that the use made by him of the premises was in accordance with intention and design.''* ' (*Barker* v. *Southern Pac. Co.,* 118 Cal.App. 748, 751 [5 P.2d 970, 6 P.2d 982].)'' (Italics added.) Two recent opinions of the District Court of Appeal quote at length from Dean Prosser's formulation of the ''invitation'' theory, yet do not decide whether it is the law of this state. (*Weyburn* v. *California Kamloops, Inc.* (1962) 200 Cal.App.2d 239, 242-243 [19 Cal.Rptr. 357]; *Miller* v. *Desilu Productions, Inc.* (1962) 204 Cal.App.2d 160, 164 [22 Cal.Rptr. 36].) But in *Smith* v. *United States* (N.D. Cal. 1953) 117 F.Supp. 525, 527, District Judge (now Circuit Judge) Hamlin ruled that under California law a camper using a free public campground in a national forest is an invitee, holding that ''California follows the rule that a person on the land of another is an invitee if the owner or occupant held out an invitation or allurement which led the visitor to believe that the use made by him of the premises was in accordance with intention and design.'' The court quotes with approval *Borgnis* v. *California-Oregon Power Co.* (1927) 84 Cal.App. 465, 468 [258 P. 394], to the

effect that " 'all are invitees who are expressly invited, regardless of any question of benefit or advantage to the inviter, even though the invitation be not individual, but to the public generally.' "

We now bring the law of California firmly and clearly in line with this array of judicial authority and sound critical thinking, by holding that section 332 of the Restatement Second of Torts sets forth the correct definition of "invitee" in this state. In so doing, as in *Dowd* v. *Portsmouth Hospital* (N.H. 1963) *supra,* 193 A.2d 788, 792, "We do not adopt the broader rule merely because it represents a 'modern trend.' We follow it because we believe it best expresses the principles of justice and reasonableness upon which our law of torts is founded."

Plaintiff cannot and does not lay claim to the status of invitee by reason of any economic benefit his presence conferred on defendant. Rather, plaintiff seeks to establish he was a public invitee within the meaning of Restatement Second of Torts, section 332, subsection (2). The contention fails to find support in the record.

Plaintiff first quotes section 2 of article I of defendant's bylaws, to the effect that "The purpose of this Corporation shall be the pleasure and enjoyment of its members, and the advancement of rowing, handball, swimming, and aquatic sports." Plaintiff construes the sequence of wording in this section to mean that "rowing, handball, swimming, and aquatic sports" were not limited to defendant's members, and hence that for these purposes the premises were thrown open to the general public. This interpretation is unreasonable on its face, and is refuted by other provisions of the bylaws which carefully spell out the limited circumstances under which the "privileges of membership" may be extended to nonmembers by unanimous vote of the board of directors.[3]

Plaintiff next urges that defendant's premises must be deemed a "public swimming pool" because of Health and Safety Code section 24100.[4] The point is palpably without merit. Section 24100 defines "public swimming pool" only

---

[3] E.g., section 13 of article V provides: "In addition to the powers and duties elsewhere in these By-Laws prescribed, the Board of Directors shall: . . . L. Extend, by unanimous vote, for a period not to exceed three months, and upon such terms as they may deem proper, the privileges of membership to such persons or organizations as in their judgment may be entitled to the distinction, . . . ."

[4] Section 24100 declares: " 'Public swimming pool,' as used in this article, means any public swimming pool, bathhouse, public swimming and bathing place and all related appurtenances."

"as used in this article," i.e., article 3 (Swimming Pool Sanitation) of chapter 1, division 20, of the code, which authorizes the State Department of Public Health to regulate and supervise the "sanitation, healthfulness, and safety of public swimming pools." These laws are expressly made applicable only to "public" bathing places, and do not *ipso facto* transform defendant's private club into a public beach.

In this connection plaintiff relies on *Askew* v. *Parker* (1957) 151 Cal.App.2d 759 [312 P.2d 342], but the case is actually authority to the contrary. In *Askew* the defendant owners of a large, church-connected swimming pool mailed general invitations to all teenage children in the community to use the pool free of charge; the county public health director was refused permission to inspect the pool "to determine the sanitary condition" thereof (Health & Saf. Code, § 24104), and obtained an injunction against further interference by defendants in his performance of this duty. The appellate court affirmed, stating that Health and Safety Code section 24100 is "a public health statute enacted for the purpose of protecting the citizens of California from the dangers which may easily lurk in contaminated waters or improperly equipped and maintained swimming pools" (*id.* at p. 762). The court held (at p. 763) that to give effect to this purpose the term "public" should be construed to include "any *artificially constructed pool* which is commonly and regularly used by many persons in a community *pursuant to a general invitation* issued to a large or indeterminate group, such as an entire community, as opposed to an invitation to a specific occasion or occasions." (Italics added.)

Not only are the waters of San Francisco Bay into which plaintiff dived not an "artificially constructed pool," but there was no such "general invitation" issued here to plaintiff and his companions. *Askew* is thus distinguishable both on its facts and its law. We conclude that plaintiff was not an invitee of defendant under any tenable theory, and next proceed to inquire whether liability can be predicated on the special rule governing trespassing children.

In a group of decisions rendered in 1958-1959 the rule set forth in section 339 of the first Restatement of Torts was adopted as the law of this state with respect to the liability of a possessor of land for the death or injury of trespassing children. (*King* v. *Lennen* (1959) 53 Cal.2d 340, 343 [1 Cal. Rptr. 665, 348 P.2d 98]; *Garcia* v. *Soogian* (1959) 52 Cal.2d 107, 110 [338 P.2d 433]; *Courtell* v. *McEachen* (1959) 51 Cal.2d 448, 457-458 [334 P.2d 870]; *Reynolds* v. *Willson*

(1958) *supra,* 51 Cal.2d 94, 98.) Since the date of those decisions, however, the Restatement Second of Torts has been promulgated. Section 339 of the new Restatement is based largely on its predecessor, but makes several changes in wording. Certain of these changes are for the purpose of clarification, while others give effect to developments in the case law occurring in the intervening three decades. (See Reporter's Notes to Rest.2d Torts (Tent. Draft No. 5, 1960) § 339, pp. 74-77; Prosser, *Trespassing Children* (1959) 47 Cal.L.Rev. 427, 435-469.) ▓ No reason appears to cling to former section 339, and the new wording of the section constitutes a worthwhile improvement in the formulation of this doctrine.

New section 339 declares: "A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if (a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and (b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and (d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and (e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children."

▓ As comment b to section 339 emphasizes, this doctrine imposes on the possessor only "a limited obligation to the child, falling short of a duty to prevent all foreseeable harm to him, but requiring reasonable care as to those conditions against which he may be expected to be unable to protect himself." (Accord, *Garcia* v. *Soogian* (1959) *supra,* 52 Cal.2d 107, 112.) Whether or not such an obligation or duty should be imposed, moreover, "depends upon a number of variable factors. The question of liability must be decided in the light of all the circumstances and not by arbitrarily placing cases in rigid categories on the basis of the type of condition involved without giving due consideration to the effect of all the factors in a particular situation." (*Id.* at p. 110 of 52 Cal.2d.) With these rules in mind we turn to the record before us.

Plaintiff's evidence is generally meager, and on certain

points borders on a failure of proof.[5] It is barely adequate to support an inference that defendant had reason to know, through past observations, that children were likely to trespass on its premises and pier for the purpose of swimming and diving.[6] But assuming that inference could legally be drawn, it would nevertheless relate only to high school youths in their middle teens such as plaintiff and his companions, for there is not a shred of evidence that infants or other young children were ever known to trespass on defendant's property and dive off its pier.[7]

This limitation dictated by the facts is crucial, for clause (b) of section 339 of the Restatement speaks of dangers to "such" children, referring back to clause (a) and the children who the possessor "knows or has reason to know" are likely to trespass. Under clause (b), therefore, the precise question presented here is whether defendant should be charged with the expectation that high school youths in their middle teens would fail to realize the risk involved in diving off its pier. ▉ As Dean Prosser succinctly puts the matter, "It is not enough that the presence of the child may be expected. There must also be *unreasonable* danger to him if he comes. If the condition is not one from which any such danger is reasonably to be anticipated, there is no negligence in failure to protect him against it, and no liability." (Italics added.) (Prosser, *Trespassing Children* (1959) 47 Cal.L.Rev. 427, 452.) ▉ Certainly there is always some degree of

[5] For example, plaintiff failed to introduce any evidence as to what was the cause in fact of his injury; rather, he appears to have tried the case on the assumption that the accident occurred when, as alleged in his complaint, "his head and body were caused . . . to violently strike the bottom of said bay." We must likewise assume that the only "artificial condition" here involved is the existence of defendant's pier itself.

[6] On this point plaintiff testified to seeing only "other adults" in the area. Joe Cardinale testified specifically that no adults ever identified themselves as belonging to the South End Rowing Club, but went on to speculate that it might have been an employee of defendant who told them not to light beach fires. (Such fires are also restricted by the San Francisco Recreation and Park Commission.) A third witness for plaintiff, Janice Babcock, "guessed" that she saw "a few of the men that would come out and go in the water from the club. . . ." No other evidence on this point, e.g., testimony of representatives of defendant called under Code of Civil Procedure section 2055, was offered by plaintiff.

[7] Plaintiff argues as much in his reply brief, where he says: "Obviously, a child of very tender years would not be attracted to the pier to use it as a means of diving and jumping. It is precisely for the age group into which Michael O'Keefe fits that the pier became an attractive nuisance. . . . The age group of the children that were in the area where Michael and his friends dove and swam were all in the same group as Michael's."

danger that because of thoughtlessness or bravado a youth of plaintiff's age may dive off a pier without first ascertaining the depth of the water below, but that danger does not appear to have been an *unreasonable* one on the facts before us. This is not a case where, for example, a pier over apparently uniformly deep water is rendered unsafe for diving by a shallow, submerged object known only to the landowner. Here defendant's pier extended over a sloping beach, and there was nothing from which users of the pier could justifiably conclude that the surrounding bottom of the bay did not likewise vary in depth. We cannot conceive of high school youths in their middle teens failing to realize that at least out to a certain point on such a pier the water below remains too shallow for safe diving. On the facts here shown, plaintiff failed to satisfy the condition of clause (b) of section 339. (See *Garcia* v. *Soogian* (1959) *supra*, 52 Cal.2d 107, 112-113; *Herrera* v. *Southern Pac. Ry. Co.* (1961) 188 Cal.App.2d 441, 448-449 [10 Cal.Rptr. 575].)

The evidence demonstrates, moreover, that plaintiff had actual knowledge and appreciation of the danger. ██ The condition of clause (c) of section 339 is fulfilled only when the injured child did not in fact "realize the risk involved."[8] ██ "The ability to appreciate danger varies, of course, with the age of the child, and there can be no recovery if the child is of sufficient age and mental capacity to look out for himself under the circumstances presented. [Citations.]" (*Garcia* v. *Soogian* (1959) *supra*, 52 Cal.2d 107, 112.) As Dean Prosser explains, "The one basic reason for a rule which distinguishes trespassing children from trespassing adults is the inability of the child to protect himself against the peril which he encounters. If that reason does not exist, it has been generally agreed that the whole policy of the special rule fails with it. The courts have been very firm in their insistence that if the child is in fact fully aware of the condition, understands and appreciates the danger which it carries, and is quite able to avoid it, he stands in no better position than any adult with similar knowledge and understanding." (Prosser, *Trespassing Children* (1959) 47 Cal.L.Rev. 427, 461.)

The most obvious fact is plaintiff's age. ██ Although we have laid down no definite age limit beyond which the rule of section 339 cannot apply, the age of the child remains an

---

[8]Such realization will ordinarily be shown by circumstantial evidence, and among that evidence falls the fact that the age, intelligence, and experience of the individual plaintiff are such that anyone similarly endowed would have realized the danger.

important element in the total picture of each case. "What might constitute an attractive nuisance to a 7-year-old child would be immaterial as applied to a 14-year-old high school student." (*Giddings* v. *Superior Oil Co.* (1951) 106 Cal.App. 2d 607, 612 [235 P.2d 843].) Beyond the age of 14, cases allowing recovery have involved such concealed or unusual dangers as high-voltage electricity or dynamite caps. (See, e.g., Prosser, *Trespassing Children* (1959) 47 Cal.L.Rev. 427, 439-442.) "As the age of the child increases, conditions become fewer for which there can be recovery under this rule, until at some indeterminate point, probably beyond the age of sixteen, there are no longer any such conditions." (Rest.2d Torts, § 339, com. c, p. 199.) ▮ As noted at the outset, plaintiff was just three months short of 16 years of age at the time of the accident. He was in the second half of his sophomore year in high school, and was receiving passing grades in all his courses. His mother agreed that he was "healthy" and "normal and active in every way." Manifestly, we are not dealing here with a plaintiff such as the 18-year-old deaf mute with the mental capacity of a child of 6, involved in *Harris* v. *Indiana General Service Co.* (1934) 206 Ind. 351 [189 N.E. 410].

Nor was plaintiff a novice in the arts of swimming and diving. He had been swimming for some three or four years prior to the accident, and had received swimming and diving lessons in high school. His diving experience at school was off the side of a pool, and it would be unreasonable to assume his instructor did not warn him of the dangers of hitting bottom. On this important question, moreover, we need not indulge in speculation: plaintiff agreed on the witness stand that he "knew" that "if you dove into shallow water that that was the wrong thing to do"; he admitted he had "always" known this fact, i.e., from "early life."

Finally, plaintiff's knowledge of the actual diving conditions at defendant's pier was extensive. He admitted having dived off that same pier some 10 or 15 times over a period of three or four months, doubtless under varying conditions of weather and tide. On the day of the accident he dived off the pier three or four times, but not always off the same side; he did not recall which side he dived off first. On the witness stand he answered in the affirmative the question, "you dove off both sides of the pier before you took the dive that ended up in your accident. Is that right?" Even more importantly, plaintiff also answered in the affirmative the question, "you

knew how deep the water was then at the place where you dove at the time of your accident, is that right?'' Plaintiff agreed that he ''knew'' that the depth of the water was ''somewhere between five and six feet,'' and testified that at the time of the accident he was about 5 feet 6 inches tall.[9]

On these facts we find persuasive precedent in *Garcia* v. *Soogian* (1959) *supra,* 52 Cal.2d 107. There, a girl 12 years and 8 months old was injured about 8 o'clock one evening when she unsuccessfully attempted to jump over a stack of prefabricated building panels. In holding that she failed to make out a case for recovery under the rule of section 339 of the first Restatement of Torts, we reasoned, ''the panels containing windows were heavy and were firmly stacked a considerable distance from the street in such a manner that the glass could be reached only at the top of the piles, 24 to 30 inches from the ground. The chance was slight that a child of plaintiff's age would fail to see the glass or appreciate what risk was presented, and there is no evidence that plaintiff was of less than average intelligence for her age. It may be, as plaintiff in effect testified, that, because it was getting dark, she did not see the glass before jumping, but defendants could not reasonably be required to foresee that there was any substantial likelihood that a normal child of more than 12 would not appreciate the danger of jumping over a large pile of building materials when darkness prevented sufficient perception of the nature of the obstacle.'' (*Id.* at pp. 112-113.)

Here, as in *Garcia,* ''the chance was slight that a child of plaintiff's age'' would fail to ''appreciate what risk was presented.'' Indeed, plaintiff actually knew he was diving in generally shallow water and knew what risks he was incurring by so doing. Those risks were not eliminated merely because plaintiff was fortunate enough to have made several previous dives without striking bottom. Moreover, although the accident took place shortly after midday, the water appears to have been opaque and the bottom not discernible beyond the edge of the beach. Thus plaintiff was in effect aware that he did not know precisely where the bottom was. As in *Garcia,* the fact that visibility was inadequate should have rendered even more obvious to a youth of plaintiff's age the dangers of diving without ''sufficient perception'' of what lay ahead.

Here again as in *Garcia,* ''In the light of the undisputed

[9]Another witness for plaintiff, Tom Zaloco, testified by deposition that about an hour after the accident the water at the point of plaintiff's last dive was found to be four feet deep. Plaintiff presented no evidence as to the movements and height of the tide at the relevant time and place.

facts now before us, there is no sound basis for concluding that the condition which caused plaintiff's injury should have been recognized as constituting an unreasonably great risk of serious bodily harm which plaintiff was unable to discover or appreciate because of [his] immaturity." (*Id.* at p. 113.) It follows that no special duty toward plaintiff arose by virtue of defendant's ownership of the property. In the absence of such a duty, the case should not be submitted to a jury. In *Garcia* we reversed a judgment for the plaintiff on the ground that the evidence was insufficient *as a matter of law* to warrant recovery under the rule governing trespassing children; we held, in effect, that no reasonable trier of fact could have found for the plaintiff on the facts shown. When, as here, the evidence at the close of the plaintiff's case is so palpably insufficient that the trial court determines that no verdict for plaintiff could be sustained, it is the duty of the court to forestall the cost and delay of further proceedings by granting defendant's motion for nonsuit. (See, e.g., *Bylling* v. *Edwards* (1961) *supra,* 193 Cal.App.2d 736; *Herrera* v. *Southern Pac. Ry. Co.* (1961) *supra,* 188 Cal.App.2d 441; *Hickey* v. *Nulty* (1960) 182 Cal.App.2d 237 [5 Cal.Rptr. 914]; *Street* v. *Glorence Bldg. Co.* (1959) 176 Cal.App.2d 191 [1 Cal.Rptr. 274]; *Davis* v. *Goodrich* (1959) 171 Cal.App.2d 92 [340 P.2d 48]; *Ashley* v. *Jones* (1954) 126 Cal.App.2d 328 [271 P.2d 918]; cf. *Joslin* v. *Southern Pac. Co.* (1961) 189 Cal.App.2d 382 [11 Cal.Rptr. 267] [judgment on demurrer]; *Gutirrez* v. *Southern Pac. Co.* (1959) 174 Cal.App.2d 866 [345 P.2d 326] [same]; *Free* v. *Furr* (1956) 140 Cal.App.2d 378 [295 P.2d 134] [judgment notwithstanding the verdict]; *Giddings* v. *Superior Oil Co.* (1951) *supra,* 106 Cal.App.2d 607, 608 [directed verdict].)

Although cited by neither party, two decisions on superficially similar facts should be noticed here. In *Hawk* v. *City of Newport Beach* (1956) 46 Cal.2d 213 [293 P.2d 48], the defendant city owned and supervised a recreational beach to which it expressly invited the public. David, a youth of 17, went swimming at the main beach area, then proceeded to an adjacent cove connected with the beach by well-defined paths. On one side of the cove was located a line of large rocks, extending some 180 to 200 feet from shore. David had not used the cove before, but had seen people diving from the rocks. In wading out to the rocks the water came up to his waist, and he could not see bottom because of its murky condition. He followed an older boy along the line of rocks to the farthest one, and watched him dive into the water and swim away

unharmed. David then dived off the same rock, which stood about 8 feet above the water, but apparently struck the bottom and severely injured himself.

For many years the city had had actual knowledge, through its lifeguards, that patrons of the beach were using this rock as a diving platform, and indeed knew of two specific occasions when someone had been injured in so doing. Nevertheless the city neither put up warning signs nor stationed a permanent lifeguard at that location, but relied only on occasional admonitions by roving lifeguards who visited the area a few times a day.

David brought suit against the city under the provisions of our former Public Liability Act.[10] Judgment for David was entered on a jury verdict, but the court granted a new trial and both sides appealed. In upholding the denial of the city's motions for directed verdict and for judgment nothwithstanding the verdict, we held that it was proper to submit to the jury the following issues: whether the rock and its surrounding area constituted a "dangerous condition" which the city had "failed to remedy," within the meaning of former Government Code section 53051; and if so, whether David was nevertheless guilty of contributory negligence.

The second case is *Skaggs* v. *Junis* (1960) 27 Ill.App.2d 251 [169 N.E.2d 684], in which the defendant, a farmer, built an earthen dam across a ravine to make a pond for watering his cattle. After the pond filled, the defendant built a cabin nearby and kept a boat, inner tubes, and a picnic table in the adjacent wooded area. The tract was at least partially visible from the public highway. Groups of adults and children began to use the pond for swimming and diving, most of them with the defendant's express permission. On a number of occasions Willard, a youth of 16, accompanied certain of his friends who had express permission to use the premises, and the defendant saw them swimming and diving in the pond. Once, the defendant gave Willard and one of his friends a boat ride on the pond. At no time did the defendant tell Willard or anyone else

---

[10]At the relevant time Government Code section 53051 provided: "A local agency is liable for injuries to persons and property resulting from the dangerous or defective condition of public property if the legislative body, board, or person authorized to remedy the condition: (a) Had knowledge or notice of the defective or dangerous condition. (b) For a reasonable time after acquiring knowledge or receiving notice, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition."

that the pond contained submerged tree stumps, nor were any signs posted warning of the presence of such stumps.

On the day of the accident, a Sunday, the defendant granted permission to the local fire department to use the pond for firefighting demonstrations and contests to which the general public was invited. Willard and his friends arrived and began swimming and diving in the pond. Defendant observed this activity. In the course of one of his dives Willard struck a submerged and invisible tree stump some 13 feet from shore, covered by only 1½ feet of water. He was seriously injured, and filed an action for damages.

During presentation of the defendant's evidence the court directed a verdict for the defendant on Count II, which charged general negligence on an attractive nuisance theory; the jury returned a verdict for the defendant on Count I, which charged wilful and wanton misconduct. The Illinois intermediate appellate court reversed, holding as to Count II that the questions ''whether the pond and premises were sufficiently attractive to entice the plaintiff to entering [*sic*] them, whether the condition of the pond and premises were such as to create an unreasonable danger to children frequenting them, whether the defendant should reasonably have foreseen harm to children from the condition of his pond and premises, and whether the plaintiff was guilty of contributory negligence, were questions for the jury under the circumstances shown in the record.'' (*Id.* at p. 689 of 169 N.E.2d.)[11]

As we stressed in *Garcia* v. *Soogian* (1959) *supra*, 52 Cal.2d 107, 110, each case of this nature ''must be judged on its own facts.'' Upon analysis it will be seen that significant distinctions separate the case before us from both *Hawk* and *Skaggs*. In each of the latter, the plaintiff entered the premises on the clearly implied invitation of the landowner; each plaintiff used the premises for the purpose for which they were held open to the public; and each plaintiff was totally ignorant of the risk involved. On such evidence the jury in each case could have found the defendant landowner to be under an affirmative duty to exercise ordinary care to keep the premises reasonably safe for the plaintiff and to discover any hidden dangers thereon. ▮▮▮ In the case at hand, by contrast, none of these elements was present. Here, plaintiff was a trespasser or, at most, a gratuitous licensee implied by sufferance; he did not use the premises for the purpose for which

---

[11]On remand the case was settled. (See *Skaggs* v. *Junis* (1963) 28 Ill.2d 199 [190 N.E.2d 731, 733].)

they were constructed and maintained; and he had actual knowledge of the circumstances and appreciated the risk presented. As stated, on this evidence no special duty toward plaintiff could have arisen by virtue of defendant's ownership of the property, and hence no issue remained for the jury.[12]

Nor is there any relevance in the holding of both *Hawk* and *Skaggs* that in the circumstances there shown the question of the plaintiff's contributory negligence was for the jury. No such issue is in this case. The question of the plaintiff's contributory negligence is a matter of defense, to be litigated, if at all, only after the plaintiff has proved the elements of his case, including the defendant's duty and breach thereof. But in actions founded on section 339 of the Restatement it is part of the *plaintiff's* case to prove that "because of his youth" he did not "discover the condition or realize the risk involved." No duty on the defendant's part arises until the plaintiff has established this crucial element of his cause of action.

As emphasized by Professors Harper and James, "The question of the child's contributory negligence is a separate problem which must be carefully distinguished from that of the land occupier's duty. . . . Unfortunately the issues are often confused." (2 Harper & James, The Law of Torts (1956) p. 1455, fn. 57; see also *id.* at p. 1454, fn. 54.) While it was proper for the courts in *Hawk* and *Skaggs* to hold the question of contributory negligence to be for the jury, as it usually is (see, e.g., *Chance* v. *Lawry's, Inc.* (1962) 58 Cal.2d 368, 375-376 [24 Cal.Rptr. 209, 374 P.2d 185]; *Peterson* v. *Grieger, Inc.* (1961) 57 Cal.2d 43, 56 [17 Cal.Rptr. 828, 367 P.2d 420]), the question whether the facts disclose a duty owed to the plaintiff by the defendant is in the first instance a question of law for the court (*Richards* v. *Stanley* (1954) 43 Cal.2d 60, 66-67 [271 P.2d 23]; Rest.2d Torts, § 328B.) "Thus a determination that the defendant is under no legal duty to the plaintiff . . . will require a decision by the court in favor of the defendant." (Rest.2d Torts, § 328B, com. c.) No such duty appearing on the facts of this case, the judgment of nonsuit was proper.

The judgment is affirmed.

Traynor, C. J., McComb, J., and Burke, J., concurred.

---

[12]In the *Hawk* case, of course, the duty of the defendant city was statutory, being imposed by the Public Liability Act (*ante,* fn. 10). We have held that recovery under that act will not be defeated merely

750

PEEK, J.—I dissent.

The nature and extent of the trial court's power to effectively withhold the fact issues of a lawsuit from the jury was carefully stated by this court in *Estate of Lances,* 216 Cal. 397, at page 400 [14 P.2d 768], as follows: "A nonsuit or a directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' [Citations.] Unless it can be said *as a matter of law,* that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury." (Italics added.) The attitude which the law requires of us in a case of this kind is therefore clear, and our inquiry is simply this: If the instant case had been submitted to the jury solely upon the evidence presented by the plaintiff, and the jury, on the basis of that evidence and legitimate inferences drawn therefrom, had duly rendered a verdict in the plaintiff's favor, would we then be compelled to reverse the judgment entered pursuant to that verdict on the ground of insufficient evidentiary support? I am convinced that we would not.

As the majority opinion recognizes, the law of this state with respect to the liability of a possessor of land for the death or injury of trespassing children is stated in section 339 of the Restatement Second of Torts. That section provides as follows:

A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

because the plaintiff was a licensee (*Gibson* v. *County of Mendocino* (1940) 16 Cal.2d 80, 84-85 [105 P.2d 105]) or, in appropriate circumstances, one who "trespassed" in violation of an ordinance (*Acosta* v. *County of Los Angeles* (1961) 56 Cal.2d 208, 212-214 [18 Cal.Rptr. 433, 363 P.2d 473, 88 A.L.R.2d 1417]). Of course, the plaintiff in *Hawk* appears to have been a "public invitee" within the meaning of section 332 of the Restatement Second of Torts, quoted hereinabove. These differences in the controlling law constitute a further ground of distinction between *Hawk* and the present case.

(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

It is my view that the record herein, though properly termed "meager" by the majority, would nevertheless support a verdict for the plaintiff based on the substantive theory set forth in section 339, and therefore would support findings that the requirements of each of the five clauses of that section were satisfied. However, since the majority has chosen to discuss only clauses (b) and (c) of the section, and purports to justify its result upon plaintiff's failure to satisfy the requirements of those clauses, I shall limit the scope of this opinion accordingly.

Clause (b) of section 339 deals with the land possessor's knowledge, actual or imputed, relative to the danger to immature trespassers faced by the artificial condition on his land. In order to justify a finding that this clause has been satisfied, there must be sufficient evidence (1) that the possessor knows or has reason to know of the existence of the condition, and (2) that the possessor realizes or should realize that the condition "will involve an unreasonable risk of death or serious bodily harm to such children." The majority, referring back to clause (a) of the section, determines that "such children" must in the circumstances of this case mean "high school youths in their middle teens," and finds *as a matter of law* that the evidence here presented could not justify a finding that defendant realized or should have realized that its pier involved an unreasonable risk of harm to such trespassing youths.

This conclusion is reached through reference to the class of trespassers: "We cannot conceive of high school youths in

their middle teens failing to realize that at least out to a certain point on such a pier the water below remains too shallow for safe diving.'' The reasoning seems to be that since trespassers of plaintiff's class are aware of the physical realities involved in diving into shallow water, they must likewise be aware of the risk involved in such action; and that such awareness negates the risk, so that defendant neither realized nor should have realized it. Aside from the question of the logical consistency of this structure, it is clear that the assumption upon which it rests cannot be taken as a matter of law. Evidence as to the depth of the water at the time of the accident was in conflict, with one estimate placing that depth at ''five and a half to six feet,'' the surface of the pier being estimated at ''about four feet'' above the surface of the water. Thus, the majority does little less than find as a matter of law that water 6 feet in depth is ''too shallow for safe diving'' from a height 4 feet above the surface. Plainly, such a finding represents an open excursion into the province of the fact-finding body.

Further, I would suppose that evidence of plaintiff's actual realization of danger might be more meaningfully considered in connection with clause (c) of section 339, i.e., that clause specifically concerned with that factor. *Defendant's* actual or expected realization of risk is the issue here, and it is clear that evidence was presented which would justify a finding in plaintiff's favor on this point. That evidence concerns warning signs placed by defendant upon its own pier.

Ironically, but understandably, it was *defendant* who sought to introduce into evidence photographs showing warning signs upon its pier, and *plaintiff* who opposed that introduction. The relevant photographs marked for identification were lettered F through I. Exhibit F for identification showed a sign which read ''Swimming & Diving From This Pier Strictly Prohibited, *Keep Off*, South End Rowing Club.'' Exhibit G for identification showed a sign which read ''No Diving.'' Exhibit H for identification showed the far end of defendant's pier, and appearing there were the signs of which closeup views were shown in exhibits F and G for identification, together with a large ''Keep Off'' sign painted in white on the surface of the pier, and a sign which said the following: ''So. End Swimmers, Danger, Submerged Sharp Obstacles Off Dock, Off Limits.'' Exhibit I for identification was essentially identical to Exhibit H for identification.

As the majority points out, none of these photographs was admitted into evidence. However, there was testimony from plaintiff's witnesses that there were signs of some kind on the pier, and the heavy emphasis laid upon the issue was evident to both court and jury. Joe Cardinale testified that he had seen the large "Keep Off" sign painted on the pier, but exhibit H for identification, the photograph in which that sign appeared, was not admitted into evidence because the other signs appearing in that photograph had not been properly identified at that time. Counsel for the defendant, in response to a question, then stated that defense witnesses would, "if necessary," identify the remaining signs in the exhibit during the defendant's case in chief. Finally, Joe Cardinale testified on cross-examination that the "No Diving" sign contained in exhibit G for identification had been seen by him at the time of the accident, though he had not been able to read it at that time. He explained this identification by reference to the texture of the sign, rather than its content: ". . . it's lighter and darker in some places." Upon plaintiff's objection, the offer into evidence was declined on the ground that Cardinale's identification was "clearly a conclusion."

It is my view that the evidence presented relative to defendant's warning signs, together with legitimate inferences to be drawn from that evidence, was sufficient to withstand a motion for nonsuit insofar as the question of defendant's awareness of danger is concerned. The evidence on this point, though not fully developed at the time of the nonsuit motion, warranted full and mature consideration by the jury rather than the summary judicial rejection which it received.

Clause (c) of section 339, as above indicated, concerns itself with the actual knowledge or awareness of the class of trespassers as regards the particular risk. Thus, the land possessor is not liable unless "the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it." In order to justify a finding that this clause has been satisfied, there must be sufficient evidence *either* that the trespasser because of his youth does not discover the dangerous condition, *or*, if he does discover it, he, because of his youth, does not realize the risk involved. Again, *as a matter of law*, the majority finds that plaintiff not only knew of the condition but also "had actual knowledge and appreciation of the danger." Primary reliance is placed upon

plaintiff's age at the time of the accident, his general health of mind and body, his swimming experience, and his prior experience in diving off the pier. The result is a persuasive argument that plaintiff *should have* realized and appreciated the risk involved in his conduct.

But that is not the inquiry. Clause (c) of section 339 does not concern itself with plaintiff's *probable* or *expected* realization of danger. It deals with his *actual* realization. Unless it can be said as a matter of law that the plaintiff *actually* realized and appreciated the danger, a nonsuit will not lie. Whether plaintiff because of his age, background, and experience *should have* so realized or appreciated, though perhaps in point of fact he did not, is a defensive matter of contributory fault, and such evidence is precisely the variety which is to be ignored upon a nonsuit motion.

The record herein contains evidence which, if believed, would support a finding that plaintiff, because of his youth and immaturity, did not realize or appreciate[1] the risk involved in diving from defendant's pier. In fact, the very evidence upon which the majority relies in part to assertedly show plaintiff's appreciation of the danger provides this support. I have reference to the evidence of plaintiff's prior experience in diving from defendant's pier. The majority seems to conclude that, because plaintiff had dived from the pier "some 10 or 15 times over a period of three or four months," and because "On the day of the accident he dived off the pier three or four times, but not always off the same side," he must therefore have realized and appreciated the danger involved. A more obvious *non sequitur* would be difficult to formulate. Given that the condition was dangerous, how can it be said that one's appreciation of that danger would be increased by a series of successful confrontations with it? On the contrary, are we not compelled to say that this evidence tends to show that plaintiff *did not* in fact appreciate the danger because his past experience had mistakenly led him to believe that it was not present?

The requirement that the infant trespassers fail to appreciate the danger "because of their youth" does not diminish the force of this observation. A jury might reasonably have found that plaintiff's failure to realize the danger was a result of immature judgment due to his youth. Whereas a mature

---

[1] "'Appreciation' of the danger is what is required to bar recovery, rather than mere knowledge of the existence of the condition, or of some possible risk." (Prosser, *Trespassing Children* (1959) 47 Cal.L.Rev. 427, 462.)

adult is usually[2] able to form a responsible judgment as to the danger of a given condition through passive observation, a youth of 16 less prone to reasoning through observation might actively confront the same danger essentially unaware of its potential for harm.[3] A jury's finding to that effect would manifestly be supported by the common sense which we have traditionally attributed to that body.

The majority relies heavily upon the case of *Garcia* v. *Soogian*, 52 Cal.2d 107 [338 P.2d 433], wherein we reversed a judgment, entered pursuant to a jury verdict for the infant plaintiff, on the ground that that verdict, based upon the theory of section 339,[4] was not supported by substantial evidence. The very different state of the *Garcia* record renders that case inapposite here. First, it is manifest that the court there, unlike the majority here, did not hold as a matter of law that plaintiff failed to satisfy the requirements of clause (c) in that she appreciated the risk involved in confronting the condition upon defendant's land. On the contrary, the court at page 113 of its opinion said the following: "It may be, as plaintiff in effect testified, that, because it was getting dark, she did not see the glass before jumping, . . ." Thus, the court's statements as to plaintiff's expected realization of danger due to her age, etc., were properly directed to the issue of contributory negligence. This is the difference. Whereas we might properly consider evidence of contributory fault in a lawsuit that has been fully tried to a jury—consider it in order to determine whether plaintiff as a matter of law was contributorily negligent or assumed the risk — we cannot properly do so when the case stands in the posture of nonsuit. In the instant case, unlike in *Garcia,* the *only* issue relating to plaintiff's conduct is whether, as a matter of law, he appreciated the danger.

[2]Again, the very presence of defendant's warning signs, which plaintiff testified that he did not see, tends to show that even mature members of the club were susceptible to lapses of judgment as to the danger of diving from the pier, though such lapses would not be "because of their youth."

[3]The opening lines of Dean Prosser's article attest to this well-known fact: "Children, as is well known to anyone who has ever been a child, are by nature unreliable and irresponsible people, who are quite likely to do almost anything. In particular, they have a deplorable tendency to stray upon land which does not belong to them, and to meddle with what they find there. In the process they not infrequently get hurt." (Prosser, *Trespassing Children* (1959) *supra,* 47 Cal.L.Rev. 427.)

[4]Section 339 of the first Restatement of Torts, pertinent to the *Garcia* case, is substantially identical to the same section of Restatement Second insofar as clauses (b) and (c) are concerned.

Secondly, it is clear that the primary basis of our *Garcia* holding was our finding that clause (b) of section 339, as a matter of law, had not been satisfied in that ''there is no sound basis for concluding that the condition which caused plaintiff's injury should have been recognized [by defendant] as constituting an unreasonably great risk of serious bodily harm which plaintiff was unable to discover or appreciate because of her immaturity.'' (*Id.* at 113.) That finding was wholly justified upon the facts of the *Garcia* case, for the window panels there involved were placed and stacked in such a manner as to render injury to immature trespassers improbable in the absence of conduct as unusual and unforeseeable as that which in fact occurred. In the instant case, however, ample evidence was presented to support a finding that defendant realized or should have realized the danger which its pier constituted to immature trespassers, and therefore a finding that clause (b) was satisfied would be justified, if not compelled. Thus, in spite of the majority's strained effort to use the general language of the *Garcia* case to support its conclusion in this case, it is patent that that holding will not bear the weight sought to be placed upon it.

It is my view that the record herein, though sparse to an extent unjustified by the factual background of this unfortunate accident, is still not so sparse as to justify the findings of the majority herein. Factual issues become legal issues at a point far removed from that which this court has today chosen, and facile language cannot effect a credible transformation short of that point.

I would reverse the judgment of nonsuit and remand for a full trial on the merits.

Peters, J., and Tobriner, J., concurred.

Appellant's petition for a rehearing was denied July 6, 1966. Peters, J., Tobriner, J., and Peek, J., were of the opinion that the petition should be granted.