Thomas James Dallas, by Illinois State Trust Company, a Corporation, His Guardian, Plaintiff-Appellee, v. Granite City Steel Company, a Corporation, Defendant-Appellant.

Gen. No. 65–22.

Fifth District.

November 8, 1965.

Rehearing denied December 7, 1965.

Wagner, Conner, Ferguson, Bertrand & Baker (Francis D. Conner and John M. Ferguson, of counsel), for appellant.

Kassly, Weihl, Carr & Bone, of East St. Louis (Rex Carr and John B. Raffaelle, of counsel), for appellee.

GOLDENHERSH, J.

Defendant, Granite City Steel Company, appeals from the judgment of the Circuit Court of Madison County, entered upon a jury verdict in the amount of $115,000.

Plaintiff's amended complaint alleges that on January 13, 1961, defendant was the owner of certain real estate known as 1816 Omaha Avenue, in Granite City, that defendant permitted the unoccupied house there situated to remain in a state of disrepair, permitted trash, rubbish and miscellaneous junk to remain on the premises, that plaintiff, then 4 years of age, was playing in a concrete block enclosure on said premises, which enclosure contained trash, rubbish and other junk, that defendant was aware that children residing in the immediate area were attracted by the abandoned house and premises and often played there, that as a direct and proximate result of defendant's negligence plaintiff was attracted to the premises and while playing there was struck in the face by trash, and suffered serious and permanent injuries.

The evidence shows that defendant operates a large steel plant in Granite City, part of which lies adjacent to Omaha Avenue. It had received a number of complaints from residents of the neighborhood because its operations caused smoke and vibration. Because of this problem, in 1958, it commenced a program of buying the property comprising several city blocks, which lay across Omaha Avenue from its plant. At that time the area it sought to acquire was primarily residential. At the time of plaintiff's injury, defendant had acquired 180 parcels of land, and at the time of trial, had effected the purchase of an additional 66 parcels, for a total of 246, of approximately 280 such parcels in the area. Most of the property was improved with small residences, and on many of the lots there were garages, sheds or other outbuildings.

Several witnesses called by plaintiff, testified that prior to defendant's purchases in the area, the homes and premises were well kept, that when defendant pur-

414

chased the various parcels, it permitted junk and debris to accumulate in yards and ash pits, permitted the buildings to deteriorate, shingles to fall off roofs, porches to fall away from houses and in general described a condition of extensive dilapidation. Photographs offered and received in evidence corroborate this testimony.

Defendant's assistant treasurer, called by plaintiff and examined under Section 60 of the Practice Act, and called again by defendant in the presentation of its case, testified that defendant had boarded up the residences, at times ranging from shortly after acquisition of a property, to several months after obtaining possession, that its plant guards patrolled the area several times daily, that its employees, on several occasions had cut the grass and weeds in the yards of the parcels it owned, that it had investigated the possibility of fencing the area, but had abandoned the idea because to do so would cost $165,000, that the cost of razing the buildings on all the property purchased to the time of trial was estimated at $55,000, approximately $200 per parcel. He stated that defendant had no intention of using the houses or sheds in any way. He testified that defendant was aware that children resided in the area, that despite the patrolling of the area by defendant's plant guards, children played in the yards, sheds and garages. After boarding up the houses, defendant had done nothing about the sheds, garages or ash pits. Defendant knew of the presence of junk and trash in the various yards and ash pits, and was informed that children were playing with these things.

On January 13, 1961, plaintiff was 4 years and 7 months old. He lived with his parents and two older brothers, Billy and Joey, aged respectively 10 and 9, at 1810 Omaha Avenue. At the time of plaintiff's injury, plaintiff's place of residence was surrounded on three sides by vacant property owned by defendant, and was directly across Omaha Avenue from defendant's steel

415

plant. The houses located at 1812, 1814, and 1816 Omaha Avenue had all been purchased by defendant some time between March and June of 1958. These houses had been boarded up. There were sheds or garages behind the boarded up houses, and behind the house known as 1816 Omaha Avenue, there was an ash pit, constructed of concrete blocks, approximately 4 to 5 feet square and 4½ feet high. The ash pit was approximately 75 or 80 feet from plaintiff's home.

Plaintiff and a playmate, Allyn Greer, then aged 4 years and 11 months, went to the premises at 1816 Omaha. They placed an old chair alongside the ash pit and climbed up into the pit. While playing in the ash pit, plaintiff tugged at a saw protruding from the ashes in the pit, and immediately thereafter began to cry. Plaintiff's older brothers, Billy and Joey, and a playmate of Billy's, Larry Mangiaracino, aged 10, were on the roof of a shed near the ash pit when they heard plaintiff cry out. They testified that they were pulling nails out of the roof, and intended to use the nails in the construction of a club house located in the yard in back of a vacant house several houses down the street. They had thrown some rocks and pieces of glass off the roof, but thought they had thrown them toward the alley, not toward the ash pit. They thought several minutes had elapsed between the time that they had last thrown a rock or piece of glass, and the time when they heard plaintiff cry out.

When the older boys heard plaintiff crying, they came down off the shed, Billy lifted plaintiff out of the ash pit and carried him home. He was bleeding from the eye. He was taken to the office of a pediatrician who referred plaintiff's parents to an eye doctor, and plaintiff was taken to McMillan Hospital in St. Louis.

It is plaintiff's theory that when plaintiff pulled or tugged on the saw, which was partially buried in the ash pit, he succeeded in pulling it loose, and when the

416

saw was pulled up and out of the ashes, it struck plaintiff in the eye. It is defendant's contention that there is no evidence which shows how plaintiff was injured, and that there is no testimony in the record to establish what instrumentality caused plaintiff's injury.

The testimony shows that when plaintiff was taken to the office of Dr. Berman, the pediatrician, the doctor was given a history of plaintiff's eye having been cut with a piece of glass. The history in the hospital record states that plaintiff suffered an eye injury "with glass."

A saw was identified as having been found near the ash pit some time after January 13, 1961, and was offered and admitted into evidence.

Defendant argues that the verdict and judgment are based upon speculation and conjecture, that plaintiff failed to prove the injury was caused by a known defective structure, or dangerous instrumentality or agency on defendant's premises, the judgment should be reversed and judgment entered for defendant. Plaintiff contends that the evidence shows that defendant should have foreseen the probability of harm to the plaintiff by reason of the conditions which existed on defendant's property, that the verdict is supported by evidence of facts and circumstances from which the jury drew reasonable inferences, and the judgment should be affirmed.

■■ In Kahn v. James Burton Co., 5 Ill2d 614, 126 NE2d 836, our Supreme Court enunciated the modern version of the doctrine which had its origin in the "turntable" or "attractive nuisance" cases. This doctrine is a clearly defined exception to the general rule that infants have no greater right than adults to go upon the land of others, and that their minority, of itself, imposes no burden on the occupier of land to expect them, or to prepare for their safety. In its opinion, at page 625, the Court said: "It is recognized, however, that an exception exists where the owner or person in possession knows,

or should know, that young children habitually frequent the vicinity of a defective structure or dangerous agency existing on the land, which is likely to cause injury to them because they, by reason of their immaturity, are incapable of appreciating the risk involved, and where the expense or inconvenience of remedying the condition is slight compared to the risk to the children. In such cases there is a duty upon the owner or other person in possession and control of the premises to exercise due care to remedy the condition or otherwise protect the children from injury resulting from it. (Wagner v. Kepler, 411 Ill 368.) The element of attraction is significant only insofar as it indicates that the trespass should be anticipated, the true basis of liability being the foreseeability of harm to the child."

Defendant contends that the rubbish, junk and debris on the premises are not defective structures, or dangerous agencies within the contemplation of Kahn v. Burton. It argues that such a situation would be presented had plaintiff fallen from or through an abandoned structure, but that there is a complete absence of evidence of the existence of any dangerous condition known to defendant which caused plaintiff's injury, and which defendant could or should have foreseen. It further points out that in the cases decided since Kahn v. Burton, the evidence showed the existence of a defective structure or dangerous agency which was the proximate cause of plaintiff's injuries. In support of this contention, it points out that in Wilinski v. Belmont Builders, Inc., 14 Ill App2d 100, 143 NE2d 69, plaintiff fell from a homemade ladder at a construction site; that in Kleren v. Bowman, 15 Ill App2d 148, 145 NE2d 810, plaintiff fell over a retaining wall from a parking lot on which the chat was slick, and in Andrews v. General Contracting Co., 37 Ill App2d 131, 185 NE2d 354, plaintiff fell from an old piece of machinery and cut his hand on tile lying on the ground. We fail to see any distinction

between the lumber pile in the Kahn case, the slick chat on the parking lot, or the occurrence in Andrews, and the case at bar. Where defendant permitted junk and debris to accumulate in the yards and ash pits of the abandoned houses, and admits it knew children played there, whether the condition thus created was sufficiently attractive to entice children to play there, and whether defendant should have anticipated the probability of injury resulting therefrom, were questions of fact for a jury. There was sufficient evidence for the jury to draw the inference that the saw embedded in the trash pit was the instrument that caused plaintiff's injury, and the verdict will not be set aside merely because the jury could have drawn different inferences from the evidence. Lindroth v. Walgreen Co., 407 Ill 121, 94 NE2d 847.

■ Defendant contends further that the evidence fails to prove, as required by Kahn v. Burton, that the expense of remedying the condition is slight compared to the risk to the children. The evidence shows that the cost of razing the buildings and cleaning up the yards of all the properties acquired by defendant would be $55,000, or somewhat over $200 per parcel. The testimony shows that defendant had no plans to use the buildings and intended ultimately to raze them. The evidence supports the conclusion that the expense or inconvenience of remedying the condition is slight compared to the risk to the children. In view of the evidence and the above authorities, the court properly refused to direct a verdict for defendant and properly refused to enter judgment for defendant notwithstanding the verdict.

There remains for consideration defendant's contention that the judgment must be reversed, and the cause remanded for a new trial, because of a number of errors enumerated in its brief. The first ground argued is that the court erred in permitting Allyn Greer to testify. At the time of trial, Allyn was 8 years of age. Outside the presence and hearing of the jury, he was interrogated

by counsel for plaintiff, counsel for defendant and the court. It appears from the record that he knew his age, the name of the school he attended, his teacher's name, his address and telephone number, knew the man wearing a robe was the judge, that he was in the City Hall at Granite City, that if he lied Jesus would punish him, and that prior to attending speech class he pronounced the word "saw" as "faw." In the presence of the jury, he identified a photograph of the ash pit, gave a coherent account of the facts leading up to the time when he saw plaintiff pulling on a saw partly embedded in the ash pit, and upon being asked to indicate how long the saw was, indicated 30 inches. He testified that after plaintiff "gave a big yank" on the saw, he started to cry and Billy, plaintiff's brother, came down off the shed and carried plaintiff home.

In Wigmore on Evidence (3rd edition) at section 505, Professor Wigmore states it is settled that no rule defines any particular age as conclusive of incapacity; in each instance the capacity of the particular child is to be investigated. The requirements essential to qualification to testify are a capacity for recollection, the ability to understand questions and frame intelligent answers, and a consciousness of the duty to speak the truth. An examination of Allyn's testimony supports the decision of the trial judge that Allyn was competent to testify. The Supreme Court, in rejecting the contention that it was error to permit an eight-year-old witness to testify, stated in Shannon v. Swanson, 208 Ill 52, 69 NE 869, at page 55: "The decision of this matter may be reviewed, but as the intelligence of the witness is to be ascertained, to some extent, by his appearance and conduct while in the presence of the court, and as the judge is vested with a degree of discretion, it is only when there has been an abuse of discretion or a manifest misapprehension of some legal principle that the decision will be reviewed. (16 Am & Eng Ency of Law, — 2d ed — 270, 271.) In the case at

bar the witness Harold was subjected to an examination. We have consulted the record with reference thereto, and agree with the trial court that the boy had sufficient mental perception and moral understanding to qualify him to speak as a witness, the weight and value of his testimony being matters for the consideration of the jury." The trial court did not err in permitting Allyn to testify.

■ Defendant contends that the court committed reversible error in the manner and words used to inform the jury that plaintiff was not qualified to testify. When plaintiff's counsel called plaintiff to testify, the court conducted a hearing outside the presence of the jury, and on the basis of the testimony there adduced, ruled that plaintiff was not competent to testify. Upon the jury's being returned to the court room, the court, in the presence, and within the hearing of the jury, said: "The Court has conducted a hearing outside the presence of the jury and at this time the Court rules that this minor child, Thomas James Dallas, under the laws of this State, is incompetent to testify as a witness, and your objection is sustained." Defendant contends that in view of this statement, and in view of the fact that the court had permitted Allyn Greer, who was only a few months older than plaintiff, to testify, the jury was left with the plain inference that plaintiff was incompetent because of some mental deficiency, and defendant was thereby prejudiced. In Webster's Third International Dictionary (1965 Ed) the word "incompetent," is defined as "lacking specific. qualifications to perform a legal function or duty or exercise a legal right often used without implication of any kind with respect to personal fitness." The use of the term "incompetent" to denote mental deficiency, although common in legal parlance, is not in general use for that purpose by laymen, and in the absence of some indication that the word was misinterpreted by the jury, it is not apparent that defendant

was prejudiced by its use. Defendant made no objection at the time, nor did it ask the court to explain its statement. Defendant cites no authorities in support of its contention and we hold that in making the statement complained of, the court did not commit error.

 Defendant urges that the court committed reversible error in admitting the testimony of twelve of plaintiff's witnesses. In May 1963, defendant served plaintiff with an interrogatory asking for the names and addresses of all persons who "possess knowledge relevant to the facts alleged in plaintiff's complaint, whether pre-occurrence or post occurrence." Plaintiff made no objection to the interrogatory, and listed several names in its answer. After both parties had announced ready for trial, plaintiff filed a supplemental answer to the interrogatory, listing the names and addresses of 14 witnesses. Plaintiff's counsel stated to the court that the names of these witnesses had not been known to him until the preceding weekend and were given to opposing counsel at the first opportunity. The record indicates that the court adjourned the trial for the day upon completion of the selection of the jury, and in discussion with counsel pointed out that defendant would have sufficient time to interview the witnesses listed in the supplemental answer, that all of the witnesses lived in the vicinity of defendant's plant, and that the witnesses were not called until the following day. Their testimony dealt with the condition of the various buildings and yards of the premises purchased by defendant, and with the fact that children played there. Many of them formerly owned and resided in houses which defendant had purchased in the area near its plant.

A similar situation was considered in Quatrano v. Marrocco, 61 Ill App2d 1, 208 NE2d 632, decided by the Appellate Court for the First District on June 29, 1965. We agree with the reasoning therein contained, and hold that in view of the opportunity given defendant to inter-

view the witnesses, the proximity of their residences to defendant's plant and the place where plaintiff was injured, and the nature of their testimony, the court did not err in permitting them to testify.

■ Defendant also charges that the court erred in refusing to permit the court reporter who transcribed the discovery depositions of the witnesses, Allyn Greer and William Dallas, to testify concerning prior inconsistent statements made by these witnesses. An examination of the record shows that the portions of the discovery depositions which defendant desired read to the jury are not impeaching of any statement contained in the testimony at the trial, and the court's ruling was not error.

■ Over defendant's objection, plaintiff's father, William Dallas, was permitted to testify that after January 13, 1961, 5 or 6 men using a truck and a bulldozer razed the garages and sheds at 1812, 1814, and 1816 Omaha, and cleaned up around the ash pit. He estimated their working time at 1½ to 2 hours. Defendant moved for a mistrial and the motion was denied. The witness testified that as an alderman of the City of Granite City, he was familiar with the cost of work of the type done by the cleanup crew, and estimated it at $80 to $100.

Defendant contends that the admission of the testimony was so prejudicial as to be reversible error, in that it was proof of precautions taken subsequent to the occurrence and was interpreted by the jury as an admission of negligence. Plaintiff urges that the witness did not testify that the defendant had caused the cleanup work to be done, that it was not offered for the purpose of proving defendant's negligence or a change in conditions subsequent to the injury, but was offered for the sole purpose of proving the cost of the work necessary to correct the hazardous condition of the premises. Plaintiff argues that this evidence was offered, and properly admitted, to prove that the expense or inconvenience of

423

remedying the condition was slight compared to the risk to the children who played there. Kahn v. Burton (supra). Defendant's assistant treasurer had testified that the garage and shed could have been torn down, the debris removed, and the property left free of trash, glass and junk, for a little over $200. He also testified as to obtaining bids for the razing of all the buildings, or in the alternative, fencing the entire area. He also testified that although no houses had been razed, a number of porches had been removed.

 Evidence of the cost of cleaning up the premises was properly admitted, and such evidence was offered by both plaintiff and defendant. Defendant is correct in its contention that evidence of what was done subsequent to January 13, 1961, was not admissible as proof of defendant's negligence, but that does not affect its admissibility for the purpose for which the evidence was offered. In the case of Eizerman v. Behn, 9 Ill App2d 263, at page 279, 132 NE2d 788, the Appellate Court, First District, said: "It is a well settled rule of law that evidence which is competent for one purpose does not become incompetent because the jury might improperly consider it in some other capacity for which it could not properly be admitted. The opponent of the evidence may, if he so wishes, ask for an instruction confining the evidence to its legitimate sphere; and if he fails to so act, he is deemed to have waived any objection he may have. (Citing cases.)" The trial court properly admitted the testimony and there is no error in its rulings on the objection and motion for mistrial.

 Defendant contends that the admission of certain testimony during the redirect examination of plaintiff's medical witness was reversible error. Dr. Kayes, an ophthalmologist testified that he performed surgery on plaintiff's injured eye, that he sutured a cut on the cornea, that the end result is an eye uncorrectible beyond the level of 20/200, that this is a 100% loss of central

vision of the eye and plaintiff, in that eye, is industrially blind. On cross-examination he was asked if a corneal transplant could be performed, and stated that he would not recommend such surgery unless something happened to plaintiff's other eye, that such an operation would put plaintiff "out of commission for a year." On redirect he said he would not recommend a corneal transplant unless the choice confronting him was such surgery or total blindness, that the operations are not always successful, and he would estimate a 50–50 chance of success. He was asked if operating on the injured eye presented any risk to the good eye, and answered that if iris tissue or pigmented tissue becomes involved in the wound, there is a possibility, but not a probability, of sympathetic ophthalmia. He defined sympathetic ophthalmia as a disease in which one eye becomes inflamed, and the other eye, although not injured, and not treated in the surgical procedure, becomes involved. He stated that this can result in blindness in both eyes. The onset of the sympathetic ophthalmia is never sooner than 10 days and the longest period reported in medical records, is 25 years. The court overruled defendant's objection to this testimony, which defendant states is speculative and prejudicial to defendant.

█ Defendant cites Butler v. Palm, 36 Ill App2d 351, 184 NE2d 633, as authority for its argument, but the situation here presented is clearly distinguishable. In Butler v. Palm, Drs. Roark and Stuttle, in answering hypothetical questions propounded to them, assumed that plaintiff had suffered a brain or spinal cord injury, when no such injury was proved. The court correctly held that the opinion of an expert is to be allowed only if based on, and supported by, facts in evidence.

█ On cross-examination, counsel for the defendant interrogated the doctor about the possibility of a corneal transplant, and the questions propounded by plaintiff's counsel on redirect were within the scope of the cross-

425

examination. Darling v. Charleston Community Memorial Hospital, 50 Ill App2d 253, 200 NE2d 149. The doctor testified to the possibility of the onset of a sympathetic ophthalmia, and the possibility of this complication is not more speculative than the possibility of the performance of the corneal transplant suggested in the cross-examination. The fact that the physician testified to a possibility does not of itself make the answer objectionable. Sourian v. Jones, 350 Ill App 365, 371, 112 NE2d 920. Under the circumstances here presented, the court did not err in overruling defendant's objection.

Defendant complains of the giving of plaintiff's instructions 8 (Illinois Pattern Jury Instructions 10.04), 6 (IPI 120.04) and 4 (IPI 1.03) and the refusal to give defendant's tendered instructions 2 (IPI 21.02) and 3 (IPI 120.01).

Plaintiff's instruction number 6 was intended to be given in cases based upon the holding in Khan v. Burton (supra). In the 1965 Additions and Revisions of IPI, the instruction (IPI 120.04) was modified, in that Paragraph Second, which formerly read "That the defendant foresaw, or in the exercise of ordinary care should have foreseen, that children would be likely to trespass on the premises.", now reads, "That the defendant foresaw, or in the exercise of ordinary care should have foreseen, that children would be likely to go upon the premises."

▇▇▇ Assuming the presence of the elements enumerated in plaintiff's instruction number 6, it is clear, under Kahn v. Burton, that defendant was required to use ordinary care to protect plaintiff from the conditions existent upon its premises. The court properly gave plaintiff's instruction number 8 (IPI 10.04), which instructed the jury that defendant was required to use ordinary care, and defendant's instruction number 1 (IPI 10.02) which defined the term.

▇▇▇ In view of defendant's duty to use ordinary care, there was no reason to define the term "trespasser" and

the court properly refused to give defendant's instruction number 3 (IPI 120.01).

In our opinion, plaintiff's instruction number 6 states fairly and accurately what plaintiff must prove under the doctrine of Kahn v. Burton, and defendant's tendered instruction number 2 (IPI 21.02) was properly refused.

The evidence clearly warrants the giving of plaintiff's instruction number 4 (IPI 1.03) and the jury was properly instructed that it could consider circumstances shown by the evidence, and draw reasonable inferences therefrom.

Finally, defendant contends that the verdict is so excessive as to indicate it was the result of passion and prejudice. The courts have repeatedly held that the amount of damages to be assessed is peculiarly a question of fact for the jury, and if the jury is properly instructed on the measure of damages, an appellate court should not substitute its judgment as to the sum to be awarded in a given case, for that of the jury. Smith v. Illinois Cent. R. Co., 343 Ill App 593, 99 NE2d 717; Hulke v. International Mfg. Co., 14 Ill App2d 5, 142 NE2d 717; Ford v. Friel, 330 Ill App 136, 70 NE2d 626. This boy had a life expectancy of 65 years, and this court will not say that the value of his eye for that period, in view of the limiting of his opportunities of employment, his pain, suffering, and resultant disfigurement, is less than the amount fixed by the jury.

For the reasons herein set forth, the judgment of the Circuit Court of Madison County is affirmed.

Judgment affirmed.

EBERSPACHER, P. J. and DOVE, J., concur.