**Earl Edward Hendricks, a Minor, by Charles R. Hendricks, His Father and Next Friend, Plaintiff-Appellee, v. Peabody Coal Company, a Corporation, Defendant-Appellant.**

Gen. No. 52,964.

First District.

September 22, 1969.

Rehearing denied October 24, 1969.

RYAN, J., dissenting.

Howard and French, of Chicago (Richard G. French, of counsel), for appellant.

James A. Dooley, of Chicago, for appellee.

ALLOY, J.

This is an appeal from a judgment of the Circuit Court of Cook County based upon a jury verdict against defendant, Peabody Coal Company, assessing damages to plaintiff in the sum of $200,000. The jury had also answered a special interrogatory finding that Earl Edward Hendricks, plaintiff, was not guilty of negligence which proximately contributed to his injuries. As the case comes before us, the question of contributory negligence is not involved in this appeal. The only issue presented is whether plaintiff made out a case sufficient to raise a jury question, or alternatively stated, whether defendant should have foreseen harm to children such as plaintiff from the nature and use being made of defendant's premises.

The record discloses that on June 19, 1960, plaintiff, who was then 16 years and 5½ months of age, was injured when he dove into a strip mine area that was filled with water, as a result of which he apparently broke his neck when his head hit the sand bottom. As a result of such injury, plaintiff is a quadriplegic and his disability is permanent. No questions of any trial errors are raised in this cause and our sole inquiry is to determine whether, under the facts before us, defendant owed a duty to plaintiff, and whether the determination of this cause was properly made an issue of fact for the jury.

It is noted that for some years prior to 1955, Peabody Coal Company was engaged in strip-mining operations in an area near Essex, Illinois, a small community of about 75 to 100 people. The body of water which was involved was in a pit in one of the abandoned strip mines located approximately 30 miles west of the city of Kankakee. The record discloses that the water-filled quarry was known throughout the city of Kankakee and vicinity, and that many people swam there and had heard about it from other persons who swam in the location. People came from as far away as Chicago, Joliet, Kankakee,

Braidwood and South Wilmington. Defendant had excavated 70 to 75 feet deep to extract all coal from the area. After the defendant had ceased its mining operations in the area in 1955, and within six months thereafter, the aperture filled with water from natural springs, rain water and snowfall, which resulted in clean, clear water and made it an excellent swimming place. The water was 35 to 50 feet deep in places. By reason of the contour of the mine, as soon as one moved a couple of feet from the shoreline, he was in deep water. It differed from a natural lake in that there was a sharp drop-off. The north and east sides of the water hole were sand. It was about half a mile long and 300 feet in width at its widest point. A sand shelf extended in varying widths from a foot to three feet along the water edges.

There was no indication by signs that the pit, which was being used for recreational purposes, was owned or maintained by anyone, but, rather, that it was just wasteland or "a swimming hole." It was also used by motor boats, water skiers, fishermen, and picnickers. It had been frequented for long periods of time by teenagers, young adults and families who would bring infants. The water-filled quarry ran generally north and south. A two-lane paved road leading from Essex, Illinois, ran parallel to the quarry. The county gravel road ran in a westerly direction which passed a private club. From this gravel road there was a dirt road running southerly to the north side of the water. It was customary for motorists to drive up and park on the north side of the body of water, almost at the edge of the pit itself.

The particular day in question, June 19, 1960, was a Sunday. Four carloads with 13 teenagers left a home in Kankakee. When the young people arrived at the north end it was too crowded to swim there, so they went to the east end of the water. A few of the boys started to dive from a three-to-four-foot bluff into the water. When

plaintiff arrived at the scene, three of his companions were diving into the water from a bluff on the east side of the north end. On this day, as on previous occasions when plaintiff had been there (this was his fifth trip there), one swimmer after another made his dive, then came to the plateau shelf and climbed up it. The sand on the shelf was stirred up and visibility made it impossible to see the location of the shelf or the bottom under the water. There was evidence that the use of the water and action of swimmers would stir the sand and make it shift. The evidence indicated that plaintiff went into the water only after seeing the other boys dive at the place several times. Each of them dove from the same spot out over the same area that plaintiff did. The evidence indicated that plaintiff was as capable in diving as the other boys. Plaintiff, however, had not yet dived at the particular place on this day. He followed one of his companions and another was waiting to follow him. From where plaintiff dove he could not see the sand and when he dove he did not know the condition of the sand in the bottom. Plaintiff ran and dived. He did not slip prior to his dive and the next thing plaintiff could remember he was laying on the bank. Other witnesses indicated that he had struck the sand at the bottom. One of his companions found him with his head partially imbedded in the sand and, with the help of others, pulled him out of the water.

From 1955 to 1960, the only policing of the area was done by defendant's employees on a part-time basis. It was only a part-time activity, and all the employees did, when they found people there, was to take down one or two of the license numbers but nothing further was done about it. It was not until after the injury to plaintiff that defendant allowed police to come onto the premises and, thereafter, signs were also put up in the quarry. There was strong evidence that there were no signs prohibiting

trespassers or warning of any danger prior to the time of the occurrence resulting in injury to plaintiff. There were also no fences or barricades of any kind anywhere nor were there any lifeguards or life preservers.

Evidence was introduced at the trial of this cause disclosing that the cost of a six-foot high steel chain link fence with steel posts set in concrete surrounding the entire pit would have cost $12,000 to $14,000, and that this would have effectively barred persons from using the premises.

It is asserted by plaintiff in this cause that as the case is now presented to this Court, the admitted facts are that (1) defendant created the condition, having excavated a deep hole out of the earth; (2) defendant abandoned the area in 1955; (3) within six months thereafter, it was filled with water thirty-five to forty-five feet deep, water which was clear and clean which defendant knew made an excellent swimming place; (4) this body of water was different from a natural lake in that there is a sharp drop-off a couple of feet from the shore, with the water following the contour of the mine; (5) when swimmers were in the water, the sand would shift from their activity in contact with it and this changed the location of the sand; (6) for a period of years, defendant knew this place was frequented by swimmers, divers, picnickers, boaters, water skiers, and fishermen; (7) defendant knew of the configuration of the pit with the shelf to the drop-off lurking just below the water surface, and that there would be large numbers of people in the place for recreation of varying ages, from adults and teenagers to infants; (8) with this knowledge, defendant undertook to police the area in an inadequate manner and not until 1961, after the accident, allowed the Essex Police Department to take over; (9) the area was not fenced, although this could have been done for a very reasonable sum; (10) defendant did not

post the area so that even adults did not know it was another's property, but described it as wasteland or a swimming hole; (11) plaintiff, as good a diver as his companions, on this particular day did a running dive, as his companions had been doing, and did not fall but went into the water, where he was found; and (12) what plaintiff struck was not known, since he seemed to go out normally on the dive and was found unconscious. These assertions made by the plaintiff are, in fact, supported by evidence in the record, although there was some dispute as to certain facts involved.

Defendant contends that plaintiff failed to show that defendant violated any duty owed to him and specifically failed to show under the precedent of Kahn v. James Burton Co., 5 Ill2d 614, 625, 126 NE2d 836, that defendant owed plaintiff a duty. It is stated in this connection that the theory of "attractive nuisance" to remove a minor from the status of a trespasser no longer appears to be the law in Illinois (Kahn v. James Burton Co., supra). Both parties to this cause agree that the test is foreseeability of injury as enunciated in Kahn v. James Burton Co., supra, rather than a vaguely announced doctrine of "attractive nuisance." The fundamental question is whether the evidence establishes a sufficient basis upon which a jury could determine that defendant was guilty of negligence toward plaintiff.

As stated in Runions v. Liberty Nat. Bank, 15 Ill App 2d 538, 147 NE2d 380 (at 504):

> "Plaintiff relies upon Kahn v. James Burton Co., 5 Ill2d 614 (1955). That case marks a departure from the traditional standards developed by the law in cases in which children are attracted to and trespass upon premises and are injured as a result thereof. All cases of this character must now be examined in the light of the Kahn case. Prior authorities must yield to the principles therein set forth. Previously,

such cases had been set apart in the category known as 'attractive nuisance' cases. The Supreme Court in the Kahn case deplored this inclination to find a 'stare decisis pigeonhole or category' because such procedure led to irreconcilable conclusions. The court cited instances of confusion in decisions. It laid down certain general principles governing cases such as the one before us, and we have carefully examined that opinion to determine whether the amended complaint here states a case within those principles."

In the Kahn case, it was noted that some of the conflicting decisions had stated that water itself could not be an attractive nuisance, but that there must be other objects present, although it was the water that caused the drowning. The court concluded that these meaningless differences were best resolved by treating such situations according to the "customary rules of ordinary negligence cases." After analyzing this situation, the court stated, in the Kahn case (at page 624):

"In view of the foregoing conflict and the fact that, as many courts have declared, a child in his youthful fancy, imagination and ingenuity can make a plaything of almost anything and is attracted by almost everything, the only proper basis for decision in such cases dealing with personal injuries to children are the customary rules of ordinary negligence cases."

The true basis of liability which the Kahn case underscored was the foreseeability of harm to the child. As the court stated (at page 625):

"The element of attraction is significant only insofar as it indicates that the trespass should be anticipated, the true basis of liability being the foreseeability of harm to the child."

41

██ In Skaggs v. Junis, 27 Ill App2d 251, 169 NE2d 684, a boy 16 years and 2 months of age dove into defendant's fenced, artificial pond on his farm, struck a submerged stump, and was paralyzed. Defendant contended that plaintiff hit the pond bottom. The plaintiff had heard about the pond from others and the pond had been used by the public for many years, frequently without defendant's permission for swimming, outings and picnics. The trial court had directed a verdict on a negligence count for the defendant and the jury found for defendant on a willful and wanton count. The Appellate Court reversed and remanded for new trial on both counts and considered that the case presented questions, first, as to defendant's foreseeability of harm to children, and, secondly, on the question of the minor's care. The court stated in that case (at page 259) :

"Giving the principles of the Kahn case their full import, and applying them to the facts in the instant case, the conclusion seems irresistible that the issues as to whether the pond and premises were sufficiently attractive to entice the plaintiff as to entering them, whether the condition of the pond and premises were such as to create an unreasonable danger to children frequenting them, whether the defendant should reasonably have foreseen harm to children from the condition of his pond and premises, and whether the plaintiff was guilty of contributory negligence, were questions for the jury under the circumstances shown in the record. We find further support for this conclusion in the following decisions handed down since the Kahn case was decided: Haloran v. Belt Ry. Co. of Chicago, 25 Ill App2d 114, 166 NE2d 98; Wilinski v. Belmont Builders, Inc. (1957), 14 Ill App2d 100, 143 NE2d 69; Kleren v. Bowman (1957), 15 Ill App2d 148, 145 NE2d 810; Runions v. Liberty Nat. Bank (1957), 15 Ill App2d

538, 147 NE2d 380; Melford v. Gaus & Brown Const. Co., Inc. (1958), 17 Ill App2d 497, 151 NE2d 128."

The court further stated, at page 260:

"With regard to the age of the plaintiff, it is our conclusion that the fact that he was 16 years and 2 months old at the time of the occurrence does not prevent the principles of the Kahn case from applying. While the plaintiff was 16 years of age, he had just completed his freshman year of high school. Moreover, the question of contributory negligence, as hereinabove noted, is preeminently a question for the jury to determine in the light of the plaintiff's capacity, intelligence, and experience."

Age alone has not been the conclusive factor and, as stated in the Restatement of the Law of Torts, 2d edition, § 339, Comment c:

"The great majority of the courts have rejected any such fixed age limit, and have held that there is no definite age beyond which the rule here stated does not apply."

Normally, under the Illinois law, the degree of care of a minor under the age of 21 is a question of fact to be determined by the jury in view of the minor's age, mental capacity and experience (Wolf v. Budzyn, 305 Ill App 603, 27 NE2d 571). This particular rule is codified in IPI 10.05, which instruction was given in this case and as to which defendant has not raised any question on this appeal.

█ Both parties have cited § 339 of the Restatement of the Law of Torts, 2d edition, as supporting the position of both appellant and appellee in this case. In such section it is stated that a possessor of land is subject to liability for physical harm to children trespassing there-

on caused by an artificial condition upon the land under certain situations. Under subsection (a) it is stated:

> "(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass."

In the case before us, the place was described as an excellent swimming place. Defendant had actual knowledge that it was used for this purpose and for recreation.

In subsection (b) of § 339 of the Restatement, it is stated:

> "(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children."

In the case before us, the children used the place not only for diving, picnicking and swimming, but for water skiing and fishing. Because of the nature of the swimming place with its quick drop-off approximately two feet from the shoreline, it involved far greater risk of death or serious bodily injury than if it was an ordinary lake with its gradual inclination. The jury could well have determined that the defendant could have foreseen the happening of the occurrence, in this case.

In subsection (c) of § 339 of the Restatement, it is stated:

> "(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it."

In the case before us, the boys with whom plaintiff swam and dived, and whose ability in swimming and diving was equal to the plaintiff's, had been diving in the

same place for one-half hour to 45 minutes prior to the injury, without any injury to themselves, which was observed by plaintiff on this and on other occasions. It was also noted in the record that the sand would be disturbed and that there would be a change in position of the sand which would not be visible to someone above the surface of the water. There was nothing unusual in plaintiff's dive in this case.

In subsection (d) of § 339 of the Restatement, it is stated:

> "(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved."

The particular location had been abandoned and had not been used since 1955. It had no future use or value according to the record in this cause. The entire body of water could have been closed off with a steel fence for between $12,000 and $14,000. This cost was slight compared to the risk to the children involved (Dallas v. Granite City Steel Co., 64 Ill App2d 409, 419, 211 NE2d 907). What could constitute a slight burden would necessarily depend upon the facts of each case and likewise upon the economic capacity of the defendant. Defendant in the case before us could have barricaded the road to prohibit entry. What could or should be done in particular cases, such as with isolated farm ponds, would obviously depend upon the facts in each case.

In subsection (e) of § 339 of the Restatement, it is stated:

> "(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children."

The record shows there were no safeguards for the protection of the children in that the area was not fenced and was not posted with any signs; that defendant undertook to police the area but did not do so effectively; and, that there were no lifeguards or other means of preventing injury or drownings on the premises.

The test of foreseeability was also the basis for determination in Driscoll v. C. Rasmussen Corp., 35 Ill2d 74, 219 NE2d 483, which was cited by defendant in support of its position. In that case (at page 78), the court stated:

"Defendant could hardly have foreseen that cans might be opened, the contents splashed on clothing and the clothing later ignited by fire obtained at other places. Such is not the natural and probable consequence of maintaining a trash pile."

In the case before us, defendant knew of the water pit and its nature and knew of the shelf and the drop-off below the surface of the water. Defendant also knew that the place was used by many persons for swimming and diving.

In the case before us, on the basis of the record, we do not believe we would be justified in stating as a matter of law that the record did not authorize submission of this cause to the jury. Had a jury determined that plaintiff was not entitled to recover, this determination would have been equally binding upon plaintiff. Since, on the basis of the record, this became a jury question, its determination by the jury should not be disturbed by this court on review. The judgment of the Circuit Court of Cook County will, therefore, be affirmed.

Affirmed.

STOUDER, J., concurs.

46

## DISSENTING OPINION

RYAN, J.

I cannot concur in the opinion of the majority of this court.

Within the tests prescribed by section 339 of the Restatement of the Law of Torts 2d and those announced by our Supreme Court in Kahn v. James Burton Co., 5 Ill2d 614, 126 NE2d 836, the defendant did not owe the plaintiff the special duty created by section 339 and the Kahn case in favor of trespassing children. The special duty therein announced is to exercise reasonable care to eliminate the danger or otherwise protect children. (Section 339(e).) Once the special duty has been created, whether or not the defendant has exercised the reasonable care required thereby is a question of fact for the jury to determine. However, the existence of the duty is not a question of fact but is a question of law and it must be determined only by the court. Prosser on Torts, 3rd edition, 207; Restatement of the Law of Torts, 2d edition, § 328B.

The plaintiff has contended and the majority opinion has adopted the contention that the sole test of liability is the foreseeability by the defendant of harm to children. With this I cannot agree. The majority opinion quotes from page 625 of the Kahn case to the effect that the true basis of liability is the foreseeability of harm to the children. This statement has been lifted from the context of the rest of the paragraph and thus has been given an entirely different meaning. The portion of the paragraph preceding this statement in the Kahn case states the general rules that the land owner is under no duty to keep his premises in any particular condition to promote the safety of the trespasser. That infants have no greater rights to go upon the lands of others than adults and that their minority of itself imposes no duty upon the oc-

47

cupier of land to expect them or prepare for their safety. The paragraph then sets forth an exception to the general rules as follows:

> "It is recognized, however, that an *exception* exists where the owner or person in possession knows, or should know, that young children habitually frequent the vicinity of a defective structure or dangerous agency existing on the land, which is likely to cause injury to them because they, by reason of their immaturity are incapable of appreciating the risk involved, and where the expense or inconvenience of remedying the condition is slight compared to the risk to the children. *In such cases* there is a duty upon the owner or other person in possession and control of the premises to exercise due care to remedy the condition or otherwise protect the children from injury resulting from it. (Citation.) The element of attraction is significant only in so far as it indicates that the trespass should be anticipated, the true basis of liability being the foreseeability of harm to the child." (Emphasis added.)

Thus, it is not in all cases of injury to trespassing children that foreseeability of harm is the test of liability. Foreseeability is the test only when the exception to the general rule is brought into existence by the presence of the situations enumerated in the paragraph above quoted: (1) owner knows or should know young children frequent the vicinity of the dangerous agency and, (2) the agency is one the owner knows or should know is likely to cause injury to the children, and (3) the children because of their immaturity are incapable of appreciating the risk involved, and (4) the expense or inconvenience of remedying the condition is slight compared to the risk to the children. The paragraph then states:

48

*"In such cases* there is a duty upon the owner . . . to use due care . . . ."* (Emphasis added.)

Thus only *in such cases* where the special duty to trespassing children has been created by the existence of the factors enumerated in the paragraph under consideration is the duty to use due care imposed upon the landowner. Once this duty to use due care is created then and only then is foreseeability the test of liability. Foreseeability is the test to be applied in determining negligence and negligent conduct does not impose liability upon a landowner for injury to trespassing children unless the special duty to use due care has been created by the existence of the circumstances enumerated.

Section 339 of the Restatement of the Law of Torts, 2d edition, states the same exception to the general rule as is announced in the Kahn case as follows:

"A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

"(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

"(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

"(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

"(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

"(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children."

The conditions set out in subsections (a), (b), (c) and (d) correspond with those conditions enumerated in Kahn necessary to create the special duty to trespassing children.

As I have above stated the question of whether a defendant owes a duty to a plaintiff under an established set of facts is not a question of fact but is a question of law to be determined by the court. However, evidence must be presented to establish the facts which, in turn, create a duty. When this evidence is capable of having different inferences drawn therefrom or when the evidence concerning the facts relating to the duty is conflicting, then the question of the existence of the facts which create the duty is a question of fact to be determined by the jury under proper instructions of the court relating to the duty. If however there is no question as to the existence or nonexistence of the facts which create the duty or if the evidence concerning the same is so overwhelming as to compel acceptance of a fact as proved by a reasonable man, then there is no question concerning duty to be submitted to the jury. See Restatement of the Law of Torts, 2d edition, section 328B, comment on clauses (a) and (b).

In light of this, we must examine the evidence as the same relates to the circumstances which are enumerated in subsections (a), (b), (c) and (d) of said section 339 and the counterparts of these subsections as the same are set out in the Kahn case. In doing so we are not trying to ascertain the foreseeability of harm to the child. We are rather trying to determine the existence of circumstances stated in subsections (a), (b), (c) and (d) of said section 339 which if present would create the duty of the defendant set out in subsection (e) of said section

339, i. e., duty to use reasonable care to eliminate the danger or otherwise protect the children. If the evidence in relation thereto is not susceptible to different inferences or is not conflicting then the jury has no role to play in determining the question of duty.

I am basing my dissent in this case primarily on subsection (c) of section 339 of the Restatement which is fully set out above. We are not dealing here with an infant of tender years who inadvertently fell into a pit filled with water or who inadvertently fell from a bank overlooking the same. We are dealing with a plaintiff who is 16 years, 5½ months of age, who knowingly dived into the pit. The question presented under subsection (c) of said section 339 is whether this plaintiff because of his youth did not discover the condition or realize the risk involved in so doing.

The testimony of the plaintiff himself under cross-examination which is relevant on this point is as follows:

Q. "And at the time that this accident occurred, did you consider yourself to be somewhat of an expert in swimming and diving?"

A. "I was good."

Q. "Not only from that day but the other four times that you had been there you were aware that the bottom went out from the shoreline approximately two and a half to three feet and then there was a sheer drop-off, weren't you?"

A. "Yes."

Q. "And you didn't know how deep it was because you had never gotten to the bottom after this drop-off, isn't that true?"

A. "Yes."

Q. "And on the date that you dove and just before you dove, you had been wading in this area and you were aware that two and a half, three feet out there was a sheer drop-off, weren't you?"

A. "Yes."

Q. "When you waded out before you dove, you could only wade out about three feet and then there was a drop-off and you would have to swim, right?"

A. "Yes."

Q. "The point at which you arrived at the drop-off —strike that—Let me ask you this question. The shoreline as it extended out for this two and a half or three feet was similar to any other shoreline, wasn't it, by that I mean you would have a very small amount of water and gradually get a little bit deeper as the bank sloped down, is that correct?"

A. "Yes."

Q. "And about the deepest that it got before the drop-off was how deep?"

A. "About three feet."

Q. "And then at the point where the drop-off starts it was abrupt or sheer, isn't that right?"

A. "Yes."

Q. "You had either this day or on previous occasions when you were there explored it to see how deep the water was after you came to this drop-off, hadn't you?"

A. "Yes."

Q. "And then when you got to the point that has been marked on there you made this running dive into the water, right?"

A. "Yes."

Q. "The time that you did that you knew there was a shelf that extended some two and a half, three feet out into the water, didn't you?"

A. "Yes."

Q. "And you knew that in order to safely dive you would necessarily have to dive over that shelf into the deeper water, isn't that so?"

A. "Yes."

Q. "In fact, that was your intention to dive out far enough so that you would miss the bottom or the shelf that was there and dive into the deep water, right?"

A. "Yes."

Q. "When you dove you hit, you dove short and hit the bottom, isn't that what happened?"

A. "Yes."

This testimony of the plaintiff indicates not only that he had discovered the condition which gave rise to his injury, but that he was well aware of the existence of the same and that he realized the risk involved, knowing that he had to dive over the ledge in order to safely complete his dive. By virtue of this knowledge the circumstances described in subsection (c) of said section 339 of the Restatement do not exist. There exists no question of fact concerning these circumstances for the jury to determine. As a matter of law, in the absence of the conditions enumerated in subsection (c), the duty to use reasonable care for the protection of the plaintiff did not exist. It is stated in Prosser on Torts, 3rd edition, page 381:

"Since the one basic reason for a rule distinguishing trespassing children from trespassing adults is the inability of the child to protect himself, the courts have been quite firm in their insistence that if the child is fully aware of the condition, understands and appreciates the risk which it carries, and is quite able to avoid it, he stands in no better position than any adult with similar knowledge and understanding."

The comment on subsection (c) of section 339 states:

"The purpose of the duty is to protect children from dangers which they do not appreciate and not

53

to protect them against harm resulting from their own immature recklessness in the case of known and appreciated danger."

In Jennings v. Glen Alden Co., 369 Pa 532, 87 A2d 206 (1952) an action was brought against the coal company for the recovery of damages for the death of a 13½-year-old boy who drowned while swimming in an abandoned strip mine. The court, relying on subsection (c) of section 339, denied recovery, stating that the duty of a possessor of land to trespassing children does not extend to those conditions the existence of which are obvious even to children and the risk of which are fully realized by them. The dissent in that case was based on the fact that there was no evidence to show that the boy knew of the risk involved in swimming in the flooded mine.

In O'Keefe v. South End Rowing Club, 64 Cal2d 729, 51 Cal Rptr 534, 414 P2d 830 (1966) the plaintiff, a high school boy, was injured when he dived from a pier and struck his head on the bottom. The court relying on subsection (c) of section 339 denied recovery because the plaintiff had actual knowledge and appreciated the danger involved. The court quoted that portion of Prosser on Torts quoted above.

The majority opinion refers to Skaggs v. Junis, 27 Ill App2d 251, 169 NE2d 684. The Skaggs case is clearly distinguishable from this case. In Skaggs there was evidence presented that there were submerged stumps in the pond and that the plaintiff, when he dived, struck his head on one of these stumps. The dangerous condition which brought about the plaintiff's injury within the meaning of section 339 was not the pond but the pond with submerged stumps in it. There was no evidence to indicate that the plaintiff had any knowledge of the existence of the submerged stumps. Thus, the conditions of subsection (c) of section 339 were clearly present in the

Skaggs case, whereas in our case they have been eliminated by the testimony of the plaintiff himself.

The fact that the jury in response to a special interrogatory found that the plaintiff was not guilty of negligence which proximately contributed to his injuries is not controlling on the issue of duty owed by the landowner. The question of the child's contributory negligence is a separate problem from that of the landowner's duty. While it is proper to hold that the question of contributory negligence is a jury question (see Skaggs case, supra), the question of whether the facts disclose a duty owed to the plaintiff by the defendant is, in the first instance, a question of law for the courts. O'Keefe v. South End Rowing Club, supra, at page 843; Jennings v. Glen Alden Co., supra, at page 209.

I also cannot agree with that part of the majority opinion which indicates that the defendant should have erected a steel chain link fence 6 feet high, supported by steel posts set in concrete at a cost of from $12,000 to $14,000. The duty is not to prevent the trespass but under the conditions enumerated in section 339 to use reasonable care for the protection of known trespassing children. I am of the opinion that it is a nearly impossible task to erect a boy-proof fence against the ingenuity of a group of teenage boys bent upon having a swim. They were willing to drive a distance of 30 miles to get to this swimming hole. It is doubtful if their ambitions to indulge in this sport could have been deterred by a 6-foot fence. Once they had breached the barrier, they would again be trespassers, and if their presence were known or should have been known to the defendant, the same duty would thereby be placed on the defendant under the conditions of section 339 as would apply if the fence were not there. Again, we must remember that we are not dealing with three, four, or five-year old children who have inadvertently wandered upon the premises. We are dealing with

sixteen-year-old boys who drove 30 miles for the express purpose of swimming on this property.

The expenditure of $12,000 to $14,000 for the erection of such a fence may be considered an insignificant expenditure when we are talking about the total assets of the defendant Peabody Coal Company. However, the law as announced by the majority opinion is not limited in its application to the Peabody Coal Company alone nor to only the large and wealthy corporations. It applies with equal force to individual owners of every farm pond in this state. I regret the implication of the majority opinion that the owners of these farm ponds must erect a 6-foot steel chain link fence supported by steel posts set in concrete to satisfy any duty they may owe to trespassing children.

The plaintiff has cited Dallas v. Granite City Steel Co., 64 Ill App2d 409, 211 NE2d 907, as holding that a required expenditure of $55,000 is not to be considered an excessive burden on the defendant. This case has been cited in the majority opinion. The Dallas case did not hold as the plaintiffs contend. In that case the estimate of the cost to raze all of the old houses was $55,000. The evidence relating to the cost of razing the building and leveling the lot where the plaintiff and other children played ranged from $80 to $200. This is the expenditure which was held insignificant as compared to the risk involved to the children.

I do not think in the case now under consideration that we can say that the expenditure of from $12,000 to $14,000 is a slight burden within the meaning of subsection (d) of section 339. I likewise do not believe that we can say that such an expenditure is "slight compared to the risk to the children" as stated in the Kahn case.

For the above reasons I respectfully dissent from the opinion of my colleagues.